**CABRIOLET PORSCHE AUDI, INC., a Florida Corporation d/b/a Cabriolet Honda Car, Plaintiff-Appellee, Cross-Appellant,**

v.

**AMERICAN HONDA MOTOR CO., INC., A California Corporation, Defendant-Appellant, Cross-Appellee.**

No. 84–5698.

United States Court of Appeals, Eleventh Circuit.

Oct. 15, 1985.

---

Stanley J. Krieger, Washington, D.C., Paul R. Marcus, Miami, Fla., Michael B. Rosenberg, Burlington, Vt., for plaintiff-appellee, cross-appellant.

J. Robert McClure, Jr., Tallahassee, Fla., William C. Owen, amicus curiae, Florida Automobile Dealers Assn.

Roland N. Smoot, Lyon & Lyon, Professional Corps., J. Donald McCarthy, Los Angeles, Cal., for defendant-appellant, cross-appellee.

Before JAMES C. HILL and ANDERSON, Circuit Judges, and GARZA*, Senior Circuit Judge.

JAMES C. HILL, Circuit Judge:

Appellant/defendant American Honda Motor Company, Inc. ("American Honda") appeals the district court's judgment that American Honda breached its contracts with appellee/plaintiff Cabriolet Porsche Audi, Inc. ("Cabriolet") and violated the federal Automobile Dealers' Day In Court Act and various Florida statutes regulating the activities of automobile distributors, importers, and manufacturers engaged in business in Florida. The district court awarded Cabriolet $4,706,645 damages.

---

* Honorable Reynaldo G. Garza, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

Both parties appeal the amount of damages.[1]

We reverse, holding that the district court's decisions that American Honda breached its contracts with Cabriolet and violated the Florida and federal statutes are based on clearly erroneous findings of fact and/or improperly drawn conclusions of law.[2] Judgment shall be entered in favor of American Honda. Since we dispose of this appeal on these grounds, we do not reach the parties' attacks on the amount of damages awarded.

### FACTS

The basic disagreement between American Honda and Cabriolet is quite simple to describe. Cabriolet, a Honda dealer which sold Honda cars, parts and accessories to the public from September 1979 to May 1980, and American Honda, the exclusive distributor of Honda products to dealers in the United States, disagree over the number of cars to which Cabriolet was entitled during the Spring of 1979 and onward, when, on account of the OPEC oil embargo and resulting oil crisis, demand for the small, fuel-efficient Honda car was high. Cabriolet claims it was entitled to all the cars it requested, or, at least, more than it received from American Honda. American Honda claims it sent Cabriolet all the cars to which it was entitled under American Honda's allocation system. When Cabriolet pursued the matter in court, the district court agreed with Cabriolet's position.

While this outlines the basic dispute, it is not enough to "see the forest" in this case.

Because we reverse the district court's decision primarily on the ground that many of the court's crucial factual findings are clearly erroneous, it is necessary to "see the trees" as well. We begin our more detailed examination of the relevant facts by identifying in greater detail the parties to this action.

*The Parties.* American Honda is a wholly owned subsidiary of the Japanese company Honda Motor Company, Limited. It is the exclusive importer and distributor of Honda automobiles throughout the United States, and receives all its cars from its Japanese parent.

Cabriolet is a Florida corporation with its principal place of business in Miami. Mr. Frank Diaz is Cabriolet's president and sole stockholder. At all times relevant to this case, Cabriolet was a dual, or non-exclusive, dealership, selling Porsches, Audis and Ferraris, in addition to Hondas.

The Cabriolet dealership was established in June of 1978 when Cabriolet agreed to purchase the assets of the De Maria Porsche-Audi-Honda-Ferrari dealership in Miami. The agreement included purchase of De Maria's Honda dealership, contingent upon American Honda's approval of Cabriolet as an authorized Honda dealer. Cabriolet filed an application with American Honda seeking such authorization. American Honda approved the application and provided Cabriolet with its standard dealership agreement, which Cabriolet signed. Although the agreement is dated October 13, 1978, the evidence shows that Cabriolet

---

1. American Honda argues the award is speculative and not supported by the evidence. Cabriolet argues that the damages awarded on account of American Honda's violations of the Florida statutes should have been trebled, pursuant to Fla.Statutes, § 320.697.

2. It is clear that the district court judge adopted virtually verbatim the proposed findings of fact and conclusions of law tendered by appellee/defendant. Indeed, the appellee affirmatively stated in its brief to this court that it would not cite to the record because such references were adequately made in the district court's findings, which, we observe, counsel writing the brief had prepared. We do not

approve of the practice of adopting verbatim the findings and legal conclusions submitted by one party to a litigation. *Keystone Plastics, Inc. v. C & P Plastics, Inc.,* 506 F.2d 960, 962 (5th Cir. 1975). While the district court's adoption of the appellee's submissions may partially explain the court's misinterpretation of the evidence and, in some cases, the law, our judgment in this case is not based upon the court's engaging in this disapproved practice. Our judgment is based on our review of the court's findings and legal conclusions against the record and the case and statutory law, which reveals many of the relevant findings to be clearly erroneous and the legal conclusions to be incorrect.

commenced its Honda operations in mid-September 1978.

Cabriolet retained Mr. Frank Petrucci, who had been the general manager at De Maria, as the general manager at Cabriolet. Cabriolet also hired Mr. Snay, who had been De Maria's sales manager, as its sales manager.

*Cabriolet's Operations during the Soft Period.* During Cabriolet's first several months as a Honda dealer (fall '78 and winter '79), the market for Honda cars was "soft" (i.e. supply exceeded demand). During this period, Cabriolet was not an effective marketer of Honda cars. For example, between September and November, Cabriolet received 109 cars, but sold only forty-four. This marketing problem was, in large part, on account of Cabriolet's policy to seek a high gross profit per car. Even though this was a "soft" period, Cabriolet refused to discount the cars below the manufacturer's suggested retail price. Honda representatives suggested that Cabriolet change its pricing policy and sell more cars. Cabriolet refused to do so.

At all times, Cabriolet had an inventory of Honda cars. However, in December of 1978, Cabriolet began to receive fewer cars than it did in its first few months of operation. For example, it did not receive any cars in December 1978 and January 1979.

*The Hot Period.* By Spring of 1979, demand for the fuel efficient Honda car had increased, primarily on account of the Arab oil embargo. Consequently, Cabriolet's sales record improved, with Cabriolet meeting nearly 100% of American Honda's sales objectives for the dealership. Indeed, during this "hot" period, Cabriolet, and competing dealers, were preselling all their cars. Cabriolet requested cars from American Honda to meet its presell commitments and general sales expectations. While American Honda sent Cabriolet cars and Cabriolet at all times had an inventory, it did not send Cabriolet all the cars it requested. Thus, Cabriolet had to return deposits it had accepted, cancel contracts it had made, and refuse to accept contracts on a number of vehicles.

Throughout this hot period, Cabriolet complained to American Honda about American Honda's failure to send all the cars it requested. American Honda took the position then (and has done so throughout this litigation) that Cabriolet was receiving all the cars to which it was entitled under American Honda's allocation system.

*The Allocation System.* Evidence introduced at trial indicates that American Honda had, at all times relevant to this lawsuit, an allocation system known as the "Day's Supply System." Under this system, dealerships are divided into a number of zones on the basis of geographical location. Each zone is given a certain number of the cars imported from Japan. The cars are then distributed within each zone by comparing all the dealers in the zone as to their rate of sales and their inventory for a given period, typically forty-four days immediately preceding an allocation. Then, through a mathematical formula, cars are allocated to the dealers so that each dealer will have approximately the same number of day's supply of cars. In its brief, appellant provides the following description of the system, which is fully supported by the record:

> The first element of the day's supply system is the dealer's sales rate. American Honda uses a set period of time immediately preceding an allocation to establish a sales rate. The precise period may have changed from time to time, but in general, it has been 44 business days.... Thus, if in the 44 business days immediately preceding an allocation a dealer has sold 44 cars, he has a travel rate of one.....

> American Honda tracks a dealer's sales through his 'warranty cards.' For the dealer to receive credit for a sale of a car, he must send the warranty card for that car to American Honda....

> The next element of the day's supply system is a dealer's inventory. American Honda knows what it has shipped to a dealer and by the receipt of the warranty cards knows what the dealer has sold. This allows American Honda to

determine the total number of cars available to the dealer for sale.... The total availability divided by the travel rate gives to American Honda each dealer's day's supply.... To maximize an allocation, it is necessary for a dealer, at the time an allocation is made, to minimize his inventory....

To bring the dealers in a given zone up to the same day's supply, American Honda determines the total number of cars available for allocation and divides it by the travel rate for all the dealers involved. Thus, if there are a thousand cars available for allocation, and the dealers in the involved area have been selling at a rate of 20 cars per day, the 'warehouse' or 'port' has a 50-day supply of cars. A dealer with a travel rate of one car per day and an inventory of 20 cars, i.e., a 20-day supply, will be entitled to 30 additional cars, i.e., the warehouse day's supply of 50 minus the dealer's day's supply of 20 multiplied by the dealer's travel rate.

As the above explanation of the system indicates, how many cars a dealer gets depends on how many cars it sells and how quickly it sells them. Also the system is a competitive one, pitting dealers in each zone against one another for their shares of the available cars. A dealer selling more cars faster than other dealers will get a higher percentage of cars in the future than will others in the zone. While the mathematical formula and other details of the system are rather complicated, all a dealer need know to understand the system is that the more cars a dealer sells and the faster it sells them, the more cars that dealer will receive. For all practical purposes, that is the bottom line of the system.

The record indicates that American Honda explained to Cabriolet, when it complained about not receiving all the cars it requested, that the reason it did not get more cars (or all the cars it requested) during the "hot" period was that it had not sold enough cars, fast enough, during the "soft" period when its future allocation rate was being set. For example, Cabriolet's allocation rate for March and April 1979, the beginning of the hot period, was based on its sales in the preceding forty-four days which included January and February when the market was "soft" and Cabriolet was not selling many cars because of its pricing policy.

*Fifteen Percent Holdback and Exclusive Facility.* American Honda did inform Cabriolet that one way a dealer could obtain more cars was to provide an exclusive Honda sales facility. This offer of extra cars in return for an exclusive facility is another aspect of the Honda allocation system. Under the system, American Honda allocates to its dealers all the cars it expects to receive from a shipment from Japan, except fifteen percent. This fifteen percent "holdback" is used to: (1) replace cars damaged on the trip from Japan; (2) allocate to new dealers, which do not yet have sales rates upon which to base allocations; and (3) provide extra cars to dealers that establish exclusive Honda facilities.

Cabriolet would not establish an exclusive facility unless American Honda would guarantee to give Cabriolet a specific number of extra cars. American Honda would not so commit. No agreement was reached.

*Sale of Cabriolet's Honda Dealership.* On October 31, 1979, Cabriolet's dealership agreement with American Honda expired by its own terms. Although it was not renewed in writing, Honda continued to send cars to Cabriolet.

In 1980, Mr. Diaz sold Cabriolet's Honda dealership to Mr. Braman. Cabriolet continued to be a Porsche and Audi dealer.

*This lawsuit.* Cabriolet brought this suit against American Honda, claiming, essentially, that American Honda's failure to give it all the cars it requested amounted to breaches of the dealership agreement, and violations of state and federal law. The district court agreed, based primarily on its conclusions that American Honda adopted an unreasonable allocation system and embarked upon a path designed to force Cabriolet to establish an exclusive facility or go out of business.

## DISCUSSION

Specifically, the district court found that American Honda breached three agreements between itself and Cabriolet: (1) the dealership agreement; (2) the "Minimum Requirements, Planning Volume" document attached to the dealership agreement; and (3) an oral agreement to deliver sixty cars. The court also found that American Honda breached the federal Automobile Dealers' Day in Court Act and various Florida statutes.

The district court's findings of these breaches and violations are based, for the most part, on two actions allegedly taken by American Honda. First, American Honda's adoption and implementation of its allocation system. Second, American Honda's efforts to encourage Cabriolet to establish an exclusive Honda facility. Thus, initially, we focus on these two actions on the part of American Honda, determining that neither action amounts to or involves any breach of contract or statutory violation. We then turn to consider those findings of breaches and violations based on other conduct, again concluding there were no breaches or statutory violations.

In reviewing the district court's decision on these matters, we are mindful of the scope of review. While we are free to review the trial court's legal conclusions *de novo*, we are bound by the trial court's factual findings unless they are "clearly erroneous." The Supreme Court has recently elaborated on the meaning of this standard in *Anderson v. City of Bessemer City, N.C.*, — U.S. —, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985):

> Although the meaning of the phrase 'clearly erroneous' is not immediately apparent, certain general principles governing the exercise of the appellate court's power to overturn findings of a district court may be derived from our cases. The foremost of these principles ... is that 'a finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52 if it undertakes to duplicate the role of the lower court. 'In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*.' *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *United States v. Yellow Cab Co.*, 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949); *see also Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).

In regard to findings based on determinations involving the credibility of witnesses, the *Anderson* court explained,

> When findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bears so heavily on the listener's understanding of and belief in what is said. See *Wainwright v. Witt*, 469 U.S. —, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence

may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. See e.g., *United States v. United States Gypsum Co., supra*, 333 U.S. at 396, 68 S.Ct. at 542. But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error. Cf. *United States v. Aluminum Co. of America*, 148 F.2d 416, 433 (CA2 1945); *Orvis v. Higgins, supra* [180 F.2d 537] at 539–40 [ (CA2 1950) ].

*Anderson*, 105 S.Ct. at 1512–13.

## I. AMERICAN HONDA'S ALLOCATION SYSTEM

■ Initially, it is important to clarify what is and is not at issue in regard to American Honda's allocation system. First, whether American Honda in fact had an allocation system is not at issue. We note that in one of its findings the district court states that American Honda did not have an allocation system at any time relevant to this case. · American Honda and Cabriolet spend much time arguing over the correctness of this finding. However, this finding is not at issue, since the district court never relied upon it in finding a breach of contract or a statutory violation.[3] Indeed, the court based all such conclusions upon its other findings that there was a system, and the adoption, implementation and content of the system were not permitted under the dealership agreement.

Further, there is no real disagreement as to the *content* of American Honda's allocation system. Both parties agree that the system is the day's supply system described in the "FACTS" section of this opinion.[4]

Finally, there is no doubt that Cabriolet received every car to which it was entitled under the day's supply system. The trial

---

**3.** We note that, in any event, this finding is clearly erroneous. All the evidence indicated that American Honda had an allocation system at the time relevant to this case. Indeed, appellee Cabriolet conceded as much in its amended complaint. In paragraph ten of the amended complaint, Cabriolet states, "at all times pertinent hereto, AMERICAN HONDA operated a system wherein it allocated HONDA motor cars to its dealers throughout the United States." In paragraph eleven, Cabriolet states that American Honda's allocation system "was known as the 'Day's Supply System.' " Cabriolet is bound by admissions in its pleadings. *Best Canvas Products & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir.1983).

**4.** Cabriolet essentially conceded as much in its amended complaint, stating,

> 10. At the time that CABRIOLET applied to AMERICAN HONDA for approval as a dealer and at all times pertinent hereto, AMERICAN HONDA operated a system wherein it allocated HONDA motor cars to its dealers throughout the United States.
> 11. The allocation system of AMERICAN HONDA during CABRIOLET'S tenure as a Honda Dealer was known as the 'Day's Supply System.'
> 12. Through this system, AMERICAN HONDA purported to offer each Honda dealer a number of cars per month so that taking into account the cars that a dealer already had available to sell at the time of allocation, upon the allocation, each dealer would have a supply of cars available to it that would 'last' approximately the same number of days. The length of time each dealer's supply would 'last' was determined by each dealer's 'rate of sales,' *i.e.*, the average number of cars sold by that dealer each day during a preceeding [sic] base allocation period.
> . . . .
> 14. Allocations under AMERICAN HONDA'S Day's Supply System were not made by city or district, but, rather, by port zone, among all dealers who were served by a given port of entry. CABRIOLET was served at all times pertinent hereto by the Port of Jacksonville, Florida and allocations were made when cars were 'received' in port.

Counsel for Cabriolet has made bold statements, particularly at oral argument, that might at first glance suggest that Cabriolet does not agree on the matter of the content of the allocation system. However, a close examination of these statements and the specific arguments Cabriolet makes in this appeal reveals that it is claiming that the allocation system was not *applied* consistently and uniformly, and not that the content of the system was other than that described in this opinion.

court never found to the contrary,[5] and Cabriolet has not raised the issue on appeal.[6]

What is at issue here is whether American Honda's allocation system—its content, adoption, or implementation—breached the dealership agreement. The district court found it breached Article VII, section 2, which provides,

> Dealer shall furnish its orders for Honda Automobiles and Honda Automobile Parts to Distributor on forms supplied by Distributor at such time or times and for such period or periods as Distributor reasonably may require from time to time, and all such orders may be accepted by Distributor in whole or as to any part thereof. All orders of Dealer shall be binding upon it unless and until they are rejected in writing by Distributor, provided, however, that in the event of a partial acceptance by Distributor, Dealer shall no longer be bound with respect to the parts of the order not accepted. *In the event of shortage or restricted supply,* Dealer gives Distributor the right to allocate such supply in any reasonable manner Distributor deems fit in any geographical market area.

(emphasis added). The court found that Honda breached this provision for three reasons: (1) it established an allocation system at a time of no shortage or restricted supply (Breach No. 1); (2) it then applied this unlawfully established allocation system to an actual shortage period and refused to modify or alter the allocation rate, thereby making American Honda's "manner of allocation" as applied to Cabriolet "unreasonable" (Breach No. 2); and (3) the system in general was not a reasonable method of allocation (Breach No. 3).

A. *Breach No. 1: Establishment of Allocation Rate at Time of No Shortage or Restricted Supply*

■ The district court's conclusion is based on a factual finding that is clearly erroneous. That finding is that the period between September 1978, when Cabriolet became a Honda dealer, and Spring 1979 was not a period of shortage or restricted supply. While the evidence may well support the finding regarding a shortage,[7] it does not with regard to restricted supply. The record shows that during this period American Honda could obtain only those cars its Japanese owner chose to send. American Honda's supply was not unlimited and must be considered "restricted."

■ Even if during the period prior to the spring of 1979 there were no shortage or restricted supply, nothing in the dealership agreement prohibits American Honda from adopting and implementing an allocation system in times of surplus or nonrestricted supply. That the contract expressly authorizes adoption of an allocation system in times of shortage or restricted supply does not mean one is forbidden at all other times. Indeed, the agreement expressly grants Honda with discretion as to the allocation of cars, stating "Dealer shall furnish its orders for Honda Automobiles ... to Distributor on forms supplied by Distributor at such time or times and for such period or periods as Distributor reasonably may require from time to time, and all such orders *may be accepted by Distributor in whole or as to any part thereof*" (emphasis added).

---

**5.** It is interesting to note that while the district court never found that Cabriolet received even one car less than it was entitled to under the system, it did find that Cabriolet received more cars than it was entitled to. In its factual finding number 25, the court stated,

> Had American Honda distributed cars during late 1978 pursuant to any purported method testified to by anyone at trial, Cabriolet would have received no more than 44 cars during October and November. No witness was able to explain why Cabriolet received ... 78 cars during October and November, 1978.

**6.** We note that, in any event, Cabriolet has not been able to point this court to any evidence in the record that shows that Cabriolet did not receive all the cars to which it was entitled under American Honda's allocation system.

**7.** We do note, however, that Cabriolet conceded in paragraph 26 of its amended complaint that "[p]rior and subsequent to Fall, 1978, HONDA cars were in short supply...."

## B. *Breach No. 2: Application of System to Shortage Period*

██ The district court found, essentially, that it was unreasonable (and thus a contract breach) to base allocation to Cabriolet during the hot period on the sales and travel rates it established during the period of nonshortage. The court took the position that American Honda should have assisted Cabriolet during the hot period by modifying the allocation system and giving it additional cars.

We disagree. Given the nature of American Honda's allocation system, we find nothing unreasonable in basing Cabriolet's allocation rate for the hot period on the sales rate it established during the soft period. American Honda's allocation system is a competitive one. Dealers in each zone are competing with each other for the limited number of cars sent from Japan. That an automobile distributor, naturally interested in selling as many cars as possible and encouraging its dealers to do so, should adopt such a competitive system is not unreasonable. Nor is it unreasonable that, under this competitive system, dealers that undertake to sell a maximum number of cars during a soft period are rewarded with more cars during the hot period than are dealers, like Cabriolet, that for their own reasons do not undertake to sell many cars. There may have been something unreasonable about this system had Cabriolet not known or been told that its failure to sell aggressively during the soft period would affect its allocation in the future. However, as will be made clear in subsequent discussion, the record does not support such a finding here. *See infra* pages 1204–1206.

We also note that Cabriolet was not at any time a dealership in trouble. Cabriolet at all times made a profit on its Honda business. Further, Cabriolet at all times had an inventory. Thus, this is not a case where an otherwise reasonable, competitive system has led to the ruination of a dealership, thereby putting into question the reasonableness of the system in application.

## C. *Breach No. 3: System Unreasonable in General*

The district court found that the allocation system, as applied in general, is not a reasonable method of allocation. The court gave five reasons for reaching this conclusion. Each of these reasons is either irrelevant or based on clearly erroneous factual findings.

The court's first reason is that the allocation system was never disclosed to the dealers including Cabriolet. According to the court, Cabriolet was never advised of the fifteen percent holdback policy or that, if it did not sell cars, subsequent allocations would be diminished.

██ That Cabriolet may not have been told about the fifteen percent holdback is irrelevant. The relevant information, at least for purposes of this appeal, is information about how a dealer could obtain cars under the allocation system. Knowledge of the fifteen percent holdback policy is not necessary for that. What is necessary is knowledge that a dealer can obtain "extra" cars from American Honda (from the fifteen percent pool) if the dealer is a new dealer or establishes an exclusive facility. The evidence shows, and Cabriolet concedes (indeed, asserts), that it was told by American Honda that it could obtain additional cars if it provided an exclusive facility. Thus, Cabriolet was knowledgeable of all it needed to know regarding the fifteen percent pool.

██ The district court's finding that the manner in which the other eighty-five percent of the cars were allocated was never disclosed to the dealers, including Cabriolet, is clearly erroneous. Representatives of every dealership, other than Cabriolet, who testified were aware of the allocation system and knew that under the system the more cars a dealer sells and the faster it sells them, the more cars the dealer receives.

Further, any finding that Cabriolet had not been told about and was not aware of the allocation system and its basic workings is not supported by the evidence. The

district court relied on the testimony of three witnesses to reach this conclusion: Mr. Diaz; Mr. Petrucci; and Mr. Snay. Mr. Diaz, the president of Cabriolet, testified that he was not informed of, or otherwise aware of, the allocation system. However, the evidence shows that Mr. Diaz relied quite heavily on Mr. Petrucci, Cabriolet's general manager, to take care of allocation matters. Thus, it was not essential to the operation of Cabriolet that Mr. Diaz knew of the system, as long as Mr. Petrucci knew of it.

Mr. Petrucci, who also had been the general manager at the De Maria dealership, and Mr. Kenneth Snay, who was De Maria's sales manager and then joined Cabriolet as its sales manager, testified that they were never told of the allocation system during the time they worked for the *De Maria dealership* (pre-September 1978). They never testified that they were not told of the system during the time they worked for Cabriolet. The uncontradicted evidence indicates that they were informed of the system while at Cabriolet. Automobile Dealer Contact Reports, prepared by Mr. Wayne Ferens, American Honda's District Sales Manager for South Florida, indicate that twice in March of 1979 Mr. Ferens "reviewed the allocation system" with representatives from Cabriolet, and Mr. Snay in particular.

Further, documentary evidence indicates that Mr. Snay and Mr. Petrucci were informed of the allocation system long before March 1979; indeed, during the De Maria dealership. Automobile Dealer Contact Reports, prepared by Mr. Ferens and his predecessor Mr. Finley, indicate that they

had explained the basics of the allocation system (i.e., to get cars, a dealer must sell cars) to Mr. Petrucci in particular a number of times in 1977 and 1978.[8]

The testimony of Mr. Petrucci and Mr. Snay indicates they were well acquainted with the workings of the system. While Mr. Petrucci did not know all the details of the system, he indicates in his testimony that he was aware that allotments were based on "how many cars are on a ship, ... how many warranty cards you [the dealer] have sent into the office in New Jersey, how many cars you might have in inventory...." Petrucci Deposition at 6. He testified, he was aware that it was important to send warranty cards in promptly "because they reflected your sales." Trial Record, vol. 10, at 241. Mr. Snay testified that, while at Cabriolet, Mr. Ferens had reminded him "how important it is to send in the warranty registrations, so when the cars do become available and they [*i.e.*, American Honda] analyze it, the inventory of the dealer body, they [American Honda] would try to replenish the inventory." *Id.* at 327. Mr. Snay also testified that he had talked to Mr. Ferens about Cabriolet's pricing policy, which had a negative effect on sales during the soft period, and that Mr. Ferens had suggested Cabriolet "[t]ake a little less profit and blow the cars out of there." *Id.* at 371.[9] In his deposition, Mr. Snay testified that he understood at the time (and now) that "blowing the cars out" would increase the number of cars Cabriolet would receive, stating "[i]f you blow X amount of units, you have the possibility of altering the amount of cars that would be returned to you or sold to you from Ameri-

---

**8.** These contact reports show, for example: (1) in March 1978, Mr. Finley "covered the facts of the most recent allocation" with Petrucci and "how [De Maria's] ... current inventory situation affects them ..."; (2) in May 1978, Mr. Ferens told Petrucci that his inventory had to be reduced "in order to increase T.R. [i.e. travel rate]"; (3) in June 1978, Mr. Ferens "reviewed allocation system with dealer personnel" and noted that De Maria's sales had been very slow and that it had "received no units from last allocation. Too slow in getting cards in"; (4) in July 1978, Mr. Ferens again reviewed De Maria's sales with Petrucci, noting that "Mr. Petruc-

ci would like more units but travel rate is very low," and that Petrucci "stated that he felt the allocation system was fair and they were not doing the job."

**9.** In his deposition, Mr. Snay indicated that Mr. Ferens may have made this comment in April or May of 1979, though he was not sure. All the other evidence in the record, including contemporaneous documents, indicate that Mr. Ferens made this comment in December 1978 or January 1979.

can Honda." Snay Deposition at 44–45. *See also* Trial Record, vol. 10, at 372–73.

We find neither the documentary evidence nor the testimony of Petrucci, Snay, and Diaz to support the trial court's finding. To the extent portions of the testimony of Petrucci's, Snay and Diaz may indicate Cabriolet lacked knowledge of or was not told about the allocation system, we find their testimony to be so contradicted by documentary evidence (i.e., the contact reports), so internally inconsistent (i.e., Petrucci's and Snay's own testimony indicating their awareness of the system), and so implausible that a "reasonable factfinder would not credit it." For these reasons, the trial court's finding, resting as it does. on any such testimony, is clearly erroneous. *Anderson*, 105 S.Ct. at 1512–13.

▇ The court's second reason for finding the allocation system unreasonable is that the system was not written down. We find this lack of a writing to be irrelevant, particularly since the evidence indicates that American Honda's allocation system was orally communicated to Cabriolet and that Cabriolet and other Honda dealers were aware of the system.

▇ The third reason given by the court is that the system is incapable of being fully described in the same manner by any two witnesses. This is a mischaracterization of the evidence. The witnesses' descriptions may have differed as to some details regarding the system, but all testified that the thrust of the system was the

more cars a dealer sells and the faster a dealer sells them, the more cars that dealer will receive from American Honda.

▇ The fourth reason given was that the system could be easily subverted by dealers who received inside information as to allocation and registered unsold cars as sold. Though neither the district court nor Cabriolet point to any evidence in the record supporting this finding, it appears from our own review that there is some such evidence. However, there is also evidence that American Honda was taking reasonable steps to prevent and detect such subversion. The evidence reveals, for example, that Honda took steps to intensify its auditing of dealerships in certain regions to discover any false reporting of sales.[10] An allocation system is not unreasonable simply because it is possible to subvert it, as long as reasonable steps are taken to prevent and detect such subversion. The evidence indicates that American Honda took such steps.

▇ The fifth reason given was that under the system distribution of the fifteen percent holdback was left to the whim and caprice of lower management personnel. This finding is clearly erroneous. The evidence shows that cars in the fifteen percent holdback pool were used for the following three purposes: (1) to replace cars damaged on the trip from Japan; (2) to establish an inventory for new dealerships, which do not yet have sales rates; and (3)

---

10. In this regard, American Honda sent the following letter, dated November 15, 1979, to Honda dealers in its eastern region:

On April 16, 1979, you were informed by letter that some dealers were reporting an abnormally high number of demonstrators and sales to questionable leasing companies. We also outlined audit procedures that would be in effect.

We are currently experiencing this same situation again and we would like to point out what action will be taken to correct the problem. Dealer's records will be audited by the District Managers.

If a unit has been reported as sold to a leasing company, you will be asked for a copy of the 'bill of sale,' which in turn must be shown as posted in the dealership 'Vehicle Sales Jour-

nal.' Those units reported as demonstrators must be in use with mileage shown. Dealer inventory cards should reflect that unit is a demonstrator.

In the event, we find sales and demonstrators reported that are not actually sold or in service, we will add the total numbers of these units to the next allocation which will increase the total availability for the dealership with a resultant decrease in the number of units allocated for the particular dealer involved.

We regret that it is necessary to do this but we will not permit a few dealers to take advantage of the majority of our dealers who report sales on an accurate and timely basis.

Defendant's Exhibit EK, 79–3409.

to provide extra cars to dealers that establish exclusive facilities for Honda cars. The evidence shows that American Honda employees had to account for the cars distributed from the fifteen percent pool.

The trial court's sixth reason for finding the system "unreasonable" was that it was not uniformly applied, as certain dealers were favored. The district court found, for example, that Honda South, one of Cabriolet's competitors, was not treated consistently with the "sell more/get more" allocation system, because "despite selling 100 cars fewer in 1978 than Honda South received from American Honda, that dealership still received almost triple the number of cars in 1979 that it received in 1978." [11] The court also pointed out that Mr. Braman, who purchased Cabriolet's Honda dealership, sold only 345 cars out of the 424 received in 1980, yet received 897 cars in 1981 and 1385 cars in 1982. Further, the court found that, had Honda distributed cars during later 1978 pursuant to its purported system, Cabriolet would have received no more than forty-four cars in October and November 1978, rather than the seventy-eight it received.

The record does not support the district court's finding that Honda's system was not uniformly applied. The record clearly indicates that, under American Honda's allocation system, one cannot determine from simply the number of cars a dealer sells in a given year, how many cars that dealer is entitled to receive the next year. Allocations are made on the basis of forty-four days periods, not years. Further, to determine the number of cars to be allocated, other factors have to be examined in addition to number of cars sold. These other factors include: (1) how many cars other dealers in the zone had sold during the relevant period and how quickly they had sold them; (2) how many cars were sent from Japan during the relevant period; (3) whether the dealer provided an exclusive Honda facility; (4) whether the dealership was a new one. The trial judge

did not remark on any of these factors. He looked only at the number of cars sold during a given year and the number received. Such evidence and reasoning are insufficient to sustain the trial court's finding that American Honda's allocation system was not uniformly applied.

Further, we do not find, and Cabriolet does not point to, any evidence in the record that would support the trial court's finding. Indeed, the evidence we do find in the record indicates that the cars were allocated in accordance with the allocation system. At trial, Mr. Esserman, owner of Honda South, explained that the reason he received so many cars in 1979 was that he sold substantially more cars in 1979 than in 1978. He explained that he had just opened the dealership in 1978 and did not yet know the product very well. In 1979, his knowledge of the product increased and, consequently, his sales record improved. The record indicates that Mr. Braman had agreed to establish an exclusive facility. Under American Honda's allocation system, this entitled him to extra cars. In regard to Cabriolet, the evidence shows that it was a new, recently opened dealership in October and November 1978, and thus under the allocation system entitled to be provided cars without strict reference to any prior sales rate. Also, Cabriolet would have been entitled to receive credit for some of the sales made by the De Maria dealership. For, though Cabriolet did not sign the Honda dealership agreement until October 13, 1978, it did start operating the De Maria dealership in September.

Finally, the court found that the allocation system was unreasonable because American Honda used the cars in fifteen percent holdback pool as "weapon[s] to coerce or attempt to coerce certain dealers like Cabriolet into making extracontractual concessions." As is shown under heading "II" of this opinion, Honda never coerced Cabriolet to make any extracontractual concessions. At the very *most*, the record shows that American Honda re-

---

11. In 1978, Honda South received 281 cars from American Honda and sold 188 of them during the year. In 1979, it received 690 cars from American Honda.

sponded to Cabriolet's requests for more cars by suggesting that Cabriolet could obtain extra cars if it established an exclusive facility.

Nor does the record indicate that American Honda used the cars in the fifteen percent holdback pool to coerce any other Honda dealer. To support its finding, the district court appears to rely primarily on evidence regarding the Friendly dealership, which was originally a Saab and Honda dealership and terminated the Saab dealership in 1980. Relying on the testimony of Friendly's vice president and general manager, Mr. Bower, the court states, "American Honda *orally* represented that additional cars would be given to Friendly if it got rid of Saab ... and threatened Friendly that 'if it didn't get bigger it would get smaller.' Shortly thereafter, Saab was no longer located at the Friendly facility...." This is a mischaracterization of the record. Mr. Bower testified that he was not forced to become an exclusive dealer, but chose to do so in 1980 because the Saab dealership was not profitable. The alleged threat about "getting smaller" was not made in connection with Friendly's terminating the Saab dealership. The record indicates the statement was made in 1983, about three years *after* Friendly terminated the Saab dealership.

 Having determined that the district court's characterizations of the allocation system as inconsistent, secretive, and coercive are clearly erroneous, we are left with a system under which allocations are based essentially on a dealer's sales record and under which a certain number of cars are reserved to replace damaged cars, to help supply new dealerships, and to encourage dealers to establish exclusive facilities for Honda cars. It may well be that left to our own devices we or the district court would have adopted a different system or modified this one. However, that is irrelevant. The sole question before us is

whether the system American Honda adopted is unreasonable. We find nothing "unreasonable" about this system. *See, e.g., Cecil Corley Motor Co. v. General Motors Corp.*, 380 F.Supp. 819, 840 (M.D. Tenn.1974).

## II. EXCLUSIVE FACILITY

The district court found that American Honda decided internally that it did not want dual dealers in South Florida and embarked on a course of conduct designed to force dealers to become exclusive or sell out. In regard to Cabriolet, that conduct, according to the district court, consisted of imposing the following sanctions upon Cabriolet for refusing to establish an exclusive facility: (1) refusing to renew the dealership agreement; (2) refusing to lower Cabriolet's capitalization requirements; and (3) refusing to give Cabriolet extra cars from the fifteen percent pool.[12] Based on these findings, the court found violations of state and federal statutes and breaches of the dealership agreement. The findings with regard to renewal of the dealership agreement and Cabriolet's capitalization requirements are clearly erroneous. We find nothing in the record, nor does Cabriolet direct us to any evidence, that indicates that any such actions were threatened or performed on account of Cabriolet's failure to build an exclusive facility.

The finding with regard to the extra cars is supported in part. The record indicates and all parties concede that American Honda told Cabriolet that it could obtain additional cars if it established a facility exclusively for Honda cars. The offer was not made in any threatening or demanding manner. The district court viewed the offer as part of a scheme to force Cabriolet to become exclusive and determined the offer violated four contractual and statutory "good faith requirements": (1) the "good faith" requirement in Article III, section three of the dealership agreements; (2) the implied condition of cooperation in

12. We observe that the trial court's findings could perhaps be interpreted as conditioning receipt of *any* cars at all on the building of the exclusive facility. Such a finding is not sup-ported by the record and would be clearly erroneous. The record shows that building an exclusive facility was a condition only of receiving *extra* cars.

the dealership agreement; (3) the federal Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221, *et seq.*; and (4) Florida Statutes, section 320.64(6). It is the district court's conclusions that the offer was not made in good faith and was violative of the contract and statutory provisions that are not supported by the record or case law.

### A. *The Dealership Agreement*

■ Article III, section 3 provides,

If during the term of this Agreement, expansion of Dealer's premises is necessary to properly sell and service customers, it is agreed that Dealer and Distributor will enter into a bona fide and good faith negotiation to determine the extent of improvements necessary to fulfill the requirements of such expansion of business. Upon agreement by Distributor and Dealer of any change of said description and/or plans, a new 'Description and Plans of Dealer's Premises' shall be prepared, signed by Dealer, and approved by Distributor in writing.

Cabriolet argues that Honda negotiated in "bad faith" because Honda refused to execute a written agreement that would guarantee a specific number of additional cars if expansion took place. We do not find this to constitute a lack of good faith. The evidence showed that American Honda had no control over the number of cars sent by its Japanese parent and thus could not guarantee in advance how many cars it would have at any given time. Under such circumstances, it is not bad faith to refuse to guarantee, in writing or otherwise, that a certain number of cars would be provided. Indeed, under these circumstances, it would be bad faith to make such a guarantee, knowing it may well not be performed. Honda's conduct here did not constitute a breach of this good faith provision in the dealership agreement.

■ The court also found that American Honda breached an implied condition of cooperation in the dealership agreement "when, for its own extra-contractual purposes it failed to provide vehicles [to Cabriolet] ... when procedures were available to grant relief even under the terms of

its purported system of allocation." Here, the court is apparently referring to American Honda's refusal to give Cabriolet extra cars from the fifteen percent pool unless Cabriolet established an exclusive facility.

Even assuming such an implied condition exists, we find no breach. Cabriolet received every car it was entitled to receive under the allocation system. As becomes clear in our upcoming discussion of the federal and state statutory violations, we find nothing unreasonable, unfair or coercive about American Honda's policy of using the cars in the fifteen percent pool to encourage dealers to establish exclusive facilities. It must be remembered that Cabriolet was *not* a dealer in trouble. At all times, it had an inventory and made a profit.

### B. *The Federal Automobile Dealers' Day in Court Act and Florida Statutes, Section 320.64(6)*

■ In essence, both the Federal Act and the Florida statute prohibit automobile manufacturers/distributors from coercing or otherwise intimidating automobile dealers in regard to their business relationship. The federal Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221, *et seq.*, "gives to an automobile dealer a federal cause of action against an automobile manufacturer who fails to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, cancelling, or not renewing the franchise." *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.*, 533 F.2d 510, 514 (10th Cir.1976). *See also Joe Westbrook, Inc. v. Chrysler Corp.*, 419 F.Supp. 824, 831 (N.D.Ga.1976). The Act defines "good faith" as

the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided*, That recommendation, endorsement, exposition, persuasion, urg-

ing or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e). Case law is clear that a manufacturer fails to act in good faith for purposes of recovering under this Act only if its conduct amounts to coercion or intimidation. In absence of coercion, intimidation or threats thereof, there can be no recovery under the Act, even if the manufacturer otherwise acts in "bad faith" as that term is normally used. *E.g., Bob Maxfield, Inc. v. American Motors Corp.,* 637 F.2d 1033, 1038 (5th Cir.), *cert. denied,* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981); *Minson Plymouth, Inc. v. Chrysler Motors Corp.,* 554 F.2d 1266, 1267 (4th Cir.1977); *Fray Chevrolet Sales, Inc. v. General Motors Corp.,* 536 F.2d 683, 685 (6th Cir.1976); *Globe Motors, Inc., v. Studebaker-Packard Corp.,* 328 F.2d 645, 646 (3d Cir.1964).

Florida Statutes, section 320.64(6) also requires "coercion." That statute, in essence, prohibits motor vehicle manufacturers, distributors and importers from coercing or attempting to coerce motor vehicle dealers to enter into any agreements with them. Under section 320.697 of the Florida Statutes, any person that suffers a pecuniary loss on account of such coercion has a cause of action against the wrongdoer for damages.

 The district court found that American Honda's offer of extra cars (from the 15% pool) in return for establishing an exclusive Honda facility amounted to coercion in violation of the federal and state statutes. We disagree, holding that, as a matter of law, American Honda's conduct did not constitute "coercion."

We have little doubt that had Honda threatened to deny Cabriolet all cars, or any cars to which it was entitled, unless Cabriolet provided an exclusive facility, this would be evidence of coercion. *See,*

*e.g., Rea v. Ford Motor Co.,* 497 F.2d 577, 585 (3d Cir.), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974); *David McGeorge Car Co. v. Leyland Motor Sales, Inc.,* 504 F.2d 52 (4th Cir.1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975); *Randy's Studebaker Sales, Inc.,* 533 F.2d at 516; *Junikki Imports, Inc. v. Toyota Motor Co.,* 335 F.Supp. 593, 595 (N.D.Ill.1971). This is not the case here.[13] American Honda did not threaten to take away, and did not take away, cars to which Cabriolet was entitled under the allocation system.[14] Nor did American Honda treat Cabriolet inequitably or unfairly when Cabriolet refused the offer. Cabriolet continued to receive cars from American Honda and maintain an inventory until it sold its dealership to Mr. Braman. Cabriolet did not receive extra cars, but it received no less than it was entitled to receive under the allocation plan.

All American Honda did was suggest to Cabriolet a way to obtain extra cars—that is, more cars than Cabriolet was entitled to receive. This does not amount to coercion. American Honda's suggestion did not present a "condition[ ] [i.e., the exclusive facility] which benefit[ed] only, or primarily, the manufacturer," as is typically the case in cases of "coercion." *Volkswagen Interamericana v. Rohlsen,* 360 F.2d 437, 442 (1st Cir.), *cert. denied,* 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966). Both sides would be expected to profit if Cabriolet had gone exclusive. American Honda would have better representation in the market place and Cabriolet would have the opportunity to increase its sales and profits. We find nothing coercive in presenting to a car dealer an opportunity to reap substantial profits from an exclusive dealership in exchange for the expenditures necessary to establish the exclusive dealership. All American Honda did was provide Ca-

---

**13.** *See supra* note 12.

**14.** The only evidence of any threats of this nature was the testimony of Mr. Bower, vice president and general manager of the Friendly Dealership, that his dealership was threatened by

American Honda that "if it didn't get bigger, it would get smaller." However, this "threat" was delivered in March 1983, three years *after* Friendly decided to focus on Honda and terminate the Saab dealership.

briolet an extremely lucrative option—a carrot on a stick. American Honda's conduct amounted to nothing more than "recommendation, endorsement, exposition, persuasion, urging," which, under the federal act, "shall not be deemed to constitute a lack of good faith."

## III. MISCELLANEOUS BREACHES AND VIOLATIONS

### A. *Other Breaches of the Dealership Agreement*

The district court found breaches of two other provisions of the dealership agreement. One provision is Article II, section 1, which provides

> Subject to the provisions of this Agreement, Distributor shall sell and deliver Honda Automobiles and Honda Automobile Parts to Dealer for resale and assist the Dealer and its operation relating to the resale of and customers' service for Honda Automobiles and Honda Automobile Parts.

The district court found that by refusing to deliver available Hondas to Cabriolet (presumably from the fifteen percent holdback), American Honda failed to assist Cabriolet in its operations relating to the resale of cars.

■ It is undisputed that during December 1978 and January 1979, American Honda did not provide any cars to Cabriolet and that it did not provide Cabriolet all the cars it requested during the hot period, even though there were some cars in the fifteen percent holdback pool. Thus, there is no doubt, and Honda concedes, that the district court correctly found that Honda refused to deliver available cars to Cabriolet. However, this refusal to deliver did not amount to a breach of American Honda's contractual duty "to assist" Cabriolet in its sale of Honda cars. Article II, section one expressly provides that *"subject to provisions of this agreement,* Distributor shall ... assist dealer ..." (emphasis added). As explained above, provisions of the agreement permitted American Honda to establish· a reasonable allocation system. American Honda established such a sys-

tem. Cabriolet received all the cars to which it was entitled under that system. Cabriolet simply was not entitled to any cars during December and January and was not entitled to all the cars it requested during the hot period. Thus, American Honda "assisted" Cabriolet to the extent to which it was required under the dealership agreement.

■ The district court also found that American Honda breached Article III, section 7, which provides,

> Dealer and Distributor fully understand that a successful operation of Dealer's business will to a great extent depend on the amount of net working capital, owner's equity and line of credit with which Dealer maintains its business operations, and, therefore, Dealer agrees that it will at all times maintain as its minimum net working capital, owner's equity and lines of credit in accordance with the amount set forth in a separate minimum net working capital agreement to be executed by Dealer and Distributor at the time of the execution of this Agreement. If due to changed conditions, Distributor shall deem it necessary to materially increase or decrease the amount of minimum net working capital, owner's equity or line or lines of credit for Dealer to properly operate its business, Dealer agrees to maintain the revised amount of minimum net working capital, owner's equity, or line or lines of credit, as the case may be deemed necessary by Distributor, to meet such changed conditions for the proper operation of Dealer's business and Dealer and Distributor agree to execute a new Sales Agreement, thereof setting forth such revised amounts. If the amounts thereof are increased or decreased, Dealer will meet the new minimum net working requirements within the time agreed upon by Dealer and Distributor.

The district court found that American Honda breached this provision by requiring Cabriolet to maintain excessive net working capital in its operation and refusing to

decrease the net minimum capital requirements, even though Cabriolet received a decrease in the delivery of the number of cars upon which the minimum capital requirements were based. According to the court, those requirements were based on Cabriolet receiving 264 cars and when Cabriolet received less than that, American Honda was obligated under the dealership agreement to reduce the net working capital requirements.

We disagree. Nothing in section seven of Article III *requires* American Honda to reduce or in any way change the net working capital requirements. The provision expressly grants total discretion regarding changes to American Honda, stating, "[i]f due to changed conditions, *Distributor shall deem it necessary* to ... increase or decrease the amount of minimum net working capital ..." (emphasis added).

 Further, the district court did not award any damages for this alleged breach, and Cabriolet does not challenge this. Thus, even if there were a breach, no damages award could now be based upon it.

### B. *Breach of "Minimum Planning Volume" Document*

 The district court found that American Honda also breached a written contract between itself and Cabriolet contained in the separate "Minimum Planning Volume" document attached to the dealership agreement. That document indicates that Cabriolet's minimum planning volume is 264 cars per year. The court determined that this document obligated Honda to provide Cabriolet at least 264 cars per year and that American Honda breached this contract by not delivering that number of cars.

This finding is clearly erroneous. In support of the finding, the trial court cites only to the document. Nothing in the document indicates Honda agreed to provide 264 cars to Carbriolet. Further, virtually all the extrinsic evidence shows that the "planning volume" is not the minimum number of cars a dealer is to receive in a year, but rather is only a reflection of sales market expectation in a particular area for a particular dealer, and used for planning purposes only.

The only evidence Cabriolet points to in support of the trial court's finding is the following testimony of Mr. Diaz:

Q. Prior to the time that you signed the four pages of Exhibit 7, did you discuss planning volume with any representative of Honda?

. . . .

THE WITNESS: During the time I met with the Honda representatives, specifically Mr. Ferens and Mr. Madden both, at the offices of mine in Miami, my offices, not theirs, I was negotiating, if you will, with them for the franchise.

At that time they informed me very precisely of the terms and conditions that were required as to capitalization.

Since the franchise was, in fact, a much more expensive franchise than $79,000 in capital, the floor plan was well in excess of $150,000.

None of those were serious concerns of mine. I certainly qualified on them.

BY MR. ROSENBERG:

Q. As pertaining to the planning volume, you were told they were receiving no less than these amounts of vehicles per year, no less than how many vehicles, the amount on the—

A. Yes, 264 vehicles, and they were not only to sell these but, obviously, in theory we had to sell more if we were to increase it and American Honda would review our franchise.

Trial Record, vol. 9, at 61–62.

The vagueness of that testimony does not contradict, with clarity sufficient to support the trial court's finding; the earlier explicit testimony of this same witness, Mr. Diaz:

Q. Did you discuss with anyone at American Honda this planning volume– 264, what this meant?

A. No, I did not.

*Id.* at 58. Given this contradiction in Mr. Diaz's testimony and all the evidence indi-

cating that "minimum planning volume" is not the number of cars a dealer is to receive in a year, the district court's finding that American Honda breached the requirements of the document at issue here is clearly erroneous. *See Anderson*, 105 S.Ct. at 1512–13 ("Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination").

### C. Breach of Oral Contract for Sixty Cars

The district court found that American Honda breached an oral contract to supply Cabriolet with at least sixty additional cars during the "hot" period. The court also found that the breach of this oral agreement constituted "bad faith," in violation of the federal Automobile Dealers' Day in Court Act. While we doubt the validity of this oral modification to the dealership agreement [15] and that such a "breach" would constitute "bad faith" under the federal act,[16] we need not address this matter, since the district court did not award damages for this breach and Cabriolet does not attack its failure to do so on appeal. Indeed, at oral argument, counsel for Cabriolet characterized this matter as "somewhat of a moot point." We will not review that which is not at issue.

### D. Other Violations of Florida Statutes

The district court found that American Honda violated sections 320.64(4) and (8) and section 320.641 of the Florida Statutes. Under section 320.697, an automobile deal-

er suffering pecuniary loss on account of a violation of these provisions by a motor vehicle manufacturer, distributor, and/or importer has a cause of action against that party for damages.

Subsection 320.64(4) essentially forbids motor vehicle distributors, manufacturers, and importers from engaging in any illegal act relating to their business. The district court found that American Honda violated this provision because its breaches of the dealership agreement and violation of the federal Automobile Dealers' Day in Court Act amounted to engaging in "an illegal act relating to ... [its] business."

Because we have held that American Honda did not breach its dealership agreement or violate the federal act, the district court's decision here cannot be sustained. We also note, though we need not decide, that contract breaches and violations of the federal act apparently do not constitute an "illegal act" for purposes of the Florida statute. *See Gates v. Chrysler Corp.*, 397 So.2d 1187, 1190 (Fla.Dist.Ct.App.1981) (for purposes of the statute, an "illegal act" is an act subject to criminal penalties).

Subsection 320.64(8) is violated if a motor vehicle manufacturer, distributor or importer

> has unfairly or without due regard to the equities of a motor vehicle dealer, or without just provocation, canceled or failed to renew, the franchise agreement of such motor vehicle dealer.

Section 320.641(1)(a) provides that motor vehicle manufacturers, distributors and importers

> shall notify the motor vehicle dealer and forward a copy of such notice to the department of ... [their] intention to discontinue, cancel, or fail to renew the

---

**15.** The dealership agreement provides that only certain specifically identified Honda officials may modify it and that any such modification must be in writing. The American Honda employee who allegedly promised Cabriolet the sixty cars was not one of the Honda officials authorized to modify the dealership agreement and the alleged promise to deliver sixty cars was not in writing. The alleged oral contract for sixty cars was a modification of the dealership

agreement. That agreement permitted Honda to adopt and implement a reasonable allocation system. Honda had done so, and communicated that system to Cabriolet. Under that system, Cabriolet would not receive an extra, unearned sixty cars, unless it provided an exclusive facility or was a new dealership.

**16.** *See* discussion page 1209 of text.

franchise agreement of any of its motor vehicle dealers at least 90 days before the effective date thereof, together with the specific grounds for discontinuation, cancellation, or failure to renew of said agreement, if discontinued, canceled, or not renewed.

The district court found both sections were violated when Honda refused to renew Cabriolet's dealership agreement when it expired by its own terms on October 31, 1979. According to the court, American Honda refused to renew the agreement because Cabriolet would not erect exclusive facilities and Cabriolet had filed this lawsuit.[17]

■ We find neither 320.64(8) nor 320.-641(1)(a) applicable. Both provisions contemplate an actual termination of the business relationship between the dealer and distributer. The uncontroverted evidence shows that American Honda continued sending cars to and engaging in business with Cabriolet up until May 1980 when Mr. Diaz sold the Honda dealership to Mr. Braman. Even after the dealership agreement supposedly expired in October 1979, Honda continued to allocate cars to Cabriolet.[18] Even the district court found that American Honda at no time took any steps toward formal termination of the dealership. If anything, American Honda's conduct implied a renewal of the dealership agreement. The only step American Honda failed to take was to renew the agreement formally in writing. We will not put form above substance in this instance. American Honda's conduct did not amount to a "failure" to renew within the meaning of the Florida Statute. Thus, 320.641(1)(a) and 320.64(8) do not apply.

■ We further note that, even if these sections did apply, no pecuniary injury was suffered on account of the absence of a formal agreement. Cabriolet continued to operate as a Honda dealer and receive cars until May 1980. Cabriolet suggests it was injured in that it felt like a "second class citizen." However, the Florida statute permits damages to be awarded for pecuniary injuries only.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the district court, which concluded that American Honda breached contracts with Cabriolet and violated the federal Automobile Dealers' Day in Court Act and various Florida statutes. Judgment shall be entered in favor of appellant American Honda.

REVERSED.

---

**17.** The court further found that 320.641(1)(a) was also violated when American Honda discriminated against Cabriolet in allocation and distribution of vehicles, thereby constituting a de facto "termination" or "discontinuance" of Cabriolet's dealership, in violation of the notice requirements of Section 320.641. The record does not support a finding that Cabriolet was discriminated against in allocation. Cabriolet points to no evidence, and we do not find any evidence, indicating that Cabriolet did not re-

ceive every car to which it was entitled under American Honda's allocation system.

The court also found that American Honda violated section 320.64(7), which forbids manufacturers from "unfairly or without due regard to the equities of a dealer, or without just provocation, threaten[ing] to cancel or not renew a franchise agreement...." There is no evidence in the record to support this finding.

**18.** Between November 1979 and April 1980, Cabriolet received ninety-nine cars from Honda.