COLONIAL FORD, INC., a Utah Corporation, Plaintiff-Appellee, Cross-Appellant,

v.

FORD MOTOR COMPANY, a Delaware Corporation, Defendant-Appellant,

and

Ford Motor Credit Company, a Delaware Corporation, Defendant-Appellant, Cross-Appellee.

Nos. 76–2079, 76–2080 and 76–2083.

United States Court of Appeals, Tenth Circuit.

Feb. 5, 1979.

Rehearing Denied March 1, 1979.

Peter W. Billings, Stanford B. Owen and Peter W. Billings, Jr., of Fabian & Clendenin, Salt Lake City, Utah, for defendant-appellant Ford Motor Co.

Harold G. Christensen and R. Brent Stephens, of Snow, Christensen & Martineau, Salt Lake City, Utah, and George V. Burbach, Dearborn, Mich., for defendant-appellant and cross-appellee, Ford Motor Credit Co.

Daniel L. Berman, Richard W. Giauque and Gordon Strachan, of Berman & Giauque, Salt Lake City, Utah, for plaintiff-appellee and cross-appellant Colonial Ford, Inc.

Before SETH, Chief Judge, and DOYLE and McKAY, Circuit Judges.

McKAY, Circuit Judge.

We have granted Ford Motor Company's petition for rehearing because we may have understated a significant element of the case. While we believe some clarification of our prior opinion [1] is in order, except as clarified herein our prior opinion with respect to the dispute between Ford Motor Company and Colonial is reaffirmed. We also have granted Colonial Ford, Inc.'s petition for rehearing. We conclude that a new trial should be granted with reference to the issue of whether Ford Motor Credit Company is liable to Colonial for acts allegedly done in violation of the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–1225 (1976).

## FORD MOTOR COMPANY PETITION FOR REHEARING

In our original opinion, reported at 577 F.2d 106, we pointed out that Ford Motor insisted that Marshall Pease be given the right to acquire a forty-nine percent interest in the automobile dealership. The record also shows that Ford demanded as a condition to the franchise that Pease be given absolute control of the enterprise. This position was asserted in meetings between Robert Parr of Ford and LeGrande Belnap of the dealership. Ford's Dealer Policy Board took the status of the franchise under advisement pending a resolution of these ownership and control issues. Belnap, who had by this time acquired a large investment in the enterprise, was under significant pressure to have the franchise issue resolved. The Board nonetheless deferred action on the franchise until all conditions and demands were complied with, including the requirement that "Marshall Pease [be] given a buy-in by Belnap." It appears that on July 9th, Parr advised Belnap that Ford Motor required for reinstatement of the franchise that Pease be given control of the dealership and a forty-

1. *Colonial Ford, Inc. v. Ford Motor Co.*, 577 F.2d 106 (10th Cir. 1978).

nine percent buy-in that was to be paid from profits. Although Belnap strongly opposed the buy-in requirement, to protect his investment, he ultimately had to agree. The record shows that Pease paid $20,000.00 down on the buy-in contract and thereafter withdrew this amount from the dealership. Ford Motor's absolute requirement meant that Pease received a free ride to a forty-nine percent interest in a large dealership—which interest, of course, reduced Belnap's ownership share. Ford Motor would have us attach no consequence to Belnap's loss. In its petition for rehearing, Ford states: "There is no reason why the reduction of Belnap's stock ownership from 100% to 51% prevented him from providing additional working capital." We are not persuaded.

The dealership control arrangement was not a "management" aspect of the dealership in which Ford would have a legitimate interest, but instead was a requirement for the transfer of "ownership" to a particularly favored person. It is obvious that the position would be more attractive to a manager with ownership, but the matters are nevertheless separate. The record does not indicate the exact reason why Pease was to be placed in such a position, but it is clear that it was entirely the idea of Ford Motor and was resisted by Belnap until it became impossible to continue opposition.

Ford Motor takes the position that these events happened before a new franchise was issued. It is true these events occurred during the dealership's operation in the hiatus between Ford's notice of franchise termination to Petty Ford, Inc.—the dealership Belnap had acquired—and Belnap's formally executing his franchise agreement with Ford. Ford contends that this chronological circumstance makes the Pease buy-in a matter of "contract," and that, as a result, Ford could use the franchise to enforce everything which had gone on before. Ford apparently would consider irrelevant the pressures and coercion applied prior to formal execution of the "new" franchise: all became regularized by the franchise; all became purified as "contractual."

We cannot agree that the timing of franchises can be so manipulated to regularize improper and coercive demands and to avoid the consequences of the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–1225 (1976). These pre-franchise events described above necessarily became involved in the franchise, and the Act was violated by Ford's demands for what it blandly described as "contractual performance." The bad faith of Ford Motor Company thus carried over into the franchise and permeated the entire relationship.

## COLONIAL FORD'S PETITION FOR REHEARING

Ford Motor Credit is a wholly owned subsidiary of Ford Motor Company. Its primary business is financing the distribution of Ford automobiles by providing Ford dealers with capital. Approximately 90 percent of its multibillion dollar financing was in this enterprise; the remaining 10 percent was invested in nonautomotive loans. It is the conduct of Ford Motor Credit in providing financing to Colonial which forms the basis of the complaint against the financing subsidiary in this case. The particular issue before us on rehearing is whether Ford Motor Credit is subject to the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–1225 (1976). The Act authorizes federal court actions by automobile dealers for bad faith acts by automobile manufacturers. An "automobile manufacturer" is defined to include "any person, partnership, or corporation which acts for and is under the control of such manufacturer . . . in connection with the distribution of . . . automotive vehicles." 15 U.S.C. § 1221(a). We must determine whether Ford Motor Credit comes within the scope of this inclusive definition.

The trial court submitted the question of the Act's applicability to the jury with an instruction which in effect made "control" depend on specific overt acts in the actual transactions with Colonial. Colonial argues that a wholly owned subsidiary which acts for a manufacturer in

connection with distribution of automobiles is subject to the Act as a matter of law and that the jury should have been so instructed. We agree.[2] In light of the broad remedial purposes of the Act, the element of "control" is conclusively established by a showing that Ford Motor Credit was a wholly owned subsidiary of Ford Motor and that its involvement with Colonial was exclusively for the purpose of facilitating the distribution of automobiles manufactured by its parent.[3]

The Act is designed to curtail the kinds of coercion and intimidation of retail dealers by manufacturers made possible by the parties' relative economic inequality. *Woodard v. General Motors Corp.*, 298 F.2d 121, 127 (5th Cir.), *cert. denied*, 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 (1962); *DeCantis v. Mid-Atlantic Toyota Distributors, Inc.*, 371 F.Supp. 1238, 1241 (E.D.Va. 1974). The most obvious point of leverage in the manufacturer-dealer relationship is financing. When, as in this case, a manufacturer uses a wholly owned subsidiary to facilitate that financing, it brings the subsidiary within the remedial purposes of the Act whether or not it is shown that the manufacturer ordered the specific conduct complained of. It would be unrealistic to suppose that a wholly owned subsidiary working to facilitate the parent's distributive activities would act other than to promote the desires of its parent. Thus the Act's "control" requirement is satisfied by showing corporate ownership and confluence of interest.

2. The only question for the jury under the Act was whether Ford Motor Credit conducted itself in good faith in its relationship with Colonial. While the good faith issue was submitted to the jury in the trial below, it was submitted by means of a special interrogatory which permitted the jury to reach a conclusion based either on whether good faith actually existed or on whether the Act applied at all. The interrogatory read:
   State whether the defendant Ford Motor Credit Company failed to act in good faith in its business relations with Colonial Ford, in violation of the Dealer Day in Court Act.
   Brief of Ford Motor Credit Co., at 3.

3. A jury question may be presented if the requisite element of control is alleged on a basis

We find support for our position in *York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp.*, 447 F.2d 786 (5th Cir. 1971). In that case, a Chrysler sales subsidiary was held to be a manufacturer under the Act even though its only activity was to distribute automobiles manufactured by its parent. This result was reached despite the fact that each corporation was legally independent and operated in its own sphere. *Id.* at 791. The court analyzed the issue as follows:

The $107,000 judgment was entered against Chrysler Corporation and Chrysler Motors Corporation. Chrysler Corporation manufactures the automobiles but sells them only to Chrysler Motors Corporation, its wholly-owned sales subsidiary. Chrysler Motors has sole responsibility for distribution and marketing of Chrysler products, and it is this corporation alone which enters into franchise contracts with automobile dealerships.

Clearly both Chrysler Corporation and Chrysler Motors are automobile manufacturers as defined in the Act. Chrysler Motors is such because it is a "corporation which acts for and is under the control of such manufacturer or assembler [Chrysler Corporation] in connection with the distribution of said automotive vehicles." 15 U.S.C. § 1221(a). Either could be sued for failure "to act in good faith in performing or complying with any of the terms or provisions of the franchise." 15 U.S.C. § 1222.[4]

other than corporate parental ownership. For example, a bank that is not a part of the manufacturer's corporate empire may be alleged to be under the manufacturer's control for purposes of the Act. The question would be one for the trier of fact. *See, e. g., Volkswagen Interamericana, S.A. v. Rohlsen*, 360 F.2d 437, 441–42 (1st Cir.), *cert. denied*, 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966).

4. The court went on to suggest that a further requirement for suit was that the defendant manufacturer have a contractual relationship or agreement with the dealer. 447 F.2d at 791. In the instant case, it is unquestioned that Ford Motor Credit had entered into a contractual relationship with Colonial.

447 F.2d at 791. The *Chrysler* case did not employ a specific transactional analysis of the Act's application. Instead, it focused on the general functional relationship between the parent and the subsidiary. We take the same approach here. We hold that the Act's provisions did apply to Ford Motor Credit. We therefore order a new trial on the question of Ford Motor Credit's liability to Colonial under the provisions of the Act.

■ In addition, we expressly reaffirm our earlier conclusion that the acceptance of certain real estate installment payments by Ford Credit did not give rise to a waiver of its claims. We conclude, however, that the injunction ordered to remain in effect pending appeal—which injunction we previously indicated should be set aside—should be preserved until, upon remand, the district court is able to determine what remedial relief might be appropriate in light of today's decision. Subject to the opinion of this court as modified on rehearing, the fashioning of appropriate remedies is a matter that should be left to the court below.