Thomas P. STAMPS, Trustee for Allen-Russell Ford, Inc., of Atlanta, Plaintiff,

v.

FORD MOTOR COMPANY and Ford Motor Credit Company, Defendants.

James H. ALLEN, Plaintiff,

v.

FORD MOTOR COMPANY and Ford Motor Credit Company, Defendants.

Civ. A. Nos. C81–1731A, 83–2075A and 83–2076A.

United States District Court, N.D. Georgia, Atlanta Division.

Oct. 28, 1986.

R. Jeffrey Morrison, Atlanta, Ga., for James H. Allen.

Robert D. Feagin, Gary A. Barnes, Gambrell, Clarke, Anderson & Stolz, Atlanta, Ga., for Thomas P. Stamps, Trustee.

D.R. Cumming, Jr., John H. Fleming, Thomas M. Byrne, Sutherland, Asbill & Brennan, Atlanta, Ga., for defendants.

## ORDER

SHOOB, District Judge.

### I. *Background*

The above-styled consolidated cases involve the breakdown of the relationship between defendant Ford Motor Company ("Ford") and one of its dealers, plaintiff Allen-Russell Ford, Inc. of Atlanta ("Allen-Russell").[1] Presently before the Court are defendants' motions for summary judgment, plaintiffs' motions for judgment on the pleadings and for partial summary

---

**1.** Allen-Russell is now bankrupt and, accordingly, is represented in these actions by its trustee, Thomas P. Stamps ("Stamps").

judgment with respect to defendants' counterclaims, plaintiffs' motion to file a supplemental pleading, and various motions to strike. The following is a truncated version of the background underlying the parties' dispute but should suffice for present purposes.[2]

In 1975, Allen-Russell entered a dealership agreement with Ford. At that time, Allen-Russell was owned by Allen-Russell Enterprises, Inc., the stock of which was owned by James H. Allen ("Allen") and Ted Russell ("Russell"). By 1980, Allen-Russell Enterprises owned several automobile dealerships in Georgia, North Carolina, and Tennessee. Allen bore the primary responsibility for Allen-Russell.

From the outset of Allen-Russell's operations, defendant Ford Motor Credit Company ("FMC") financed Allen-Russell's wholesale vehicle purchases from Ford. Under the terms of the financing agreement in force between the parties, FMC had a purchase money security interest in the proceeds of any sale; thus, sale proceeds were held in trust by Allen-Russell for FMC. The financing agreement specifically stated that FMC had "the right in its sole discretion to determine the extent to which, the terms and conditions on which, and the period for which it will make advances to or on behalf of [Allen-Russell] or to extend credit to [Allen-Russell]." The financing agreement also provided that, to protect its collateral, FMC had the right to enter Allen-Russell's premises "from time to time and at all reasonable times...."

During the early years of its operation, Allen-Russell was extremely successful, but soaring interest rates and the resultant decline in sales soon caused trouble. A costly move to a new location exacerbated the dealership's difficulties. The first dispute between the parties occurred in January 1981, when FMC discovered that Allen-Russell had sold trucks worth $670,000 to Georgia Power Company without forwarding the proceeds to FMC. As a result of this "sale out of trust," FMC temporarily suspended credit to Allen-Russell. FMC also stationed an employee at Allen-Russell's premises to insure that FMC received lien discharge payment on any vehicle sold by the dealership. In addition, Richard Pollock ("Pollock"), an FMC employee, examined Allen-Russell's books. Pollock reported to FMC officials that the dealership's financial statements had been altered to present a favorable cash position and to conceal the sale out of trust to Georgia Power.

After Pollock reported the results of his audit, FMC and Allen-Russell began negotiating to reopen the credit arrangement. It was at this point that Allen-Russell's two principals decided to part ways. Each retained control of three dealerships, and Russell paid Allen $1,300,000. Allen retained the Allen-Russell Ford dealership, using the funds he received from Russell to satisfy the $670,000 obligation to FMC. Allen also retained the Colonial Lincoln-Mercury dealership ("Colonial"), which was located in Atlanta, and Royston Chrysler-Plymouth, Inc., d/b/a Carolina Dodge ("Carolina Dodge"), which was located in Charlotte, North Carolina.

After Allen paid the $670,000 to FMC, credit arrangements between the parties were reinstituted on an ad hoc basis. FMC maintains that, during the course of a credit review, it became suspicious of the manner in which Allen-Russell and its affiliated dealerships exchanged funds. Accordingly, FMC ordered a physical audit of Allen-Russell's inventory and required that Allen-Russell's lien discharge checks be certified.[3] But Allen-Russell's bank refused to certify the dealership's checks.

On June 17, 1981, Allen met with FMC officials in Dearborn, Michigan. At this meeting, FMC officials expressed concern that Allen was perpetrating a check-kiting scheme. Allen denied this charge and

---

2. The Court's factual summary is drawn, in large part, from the parties' statements of fact filed pursuant to L.R. 220-5, N.D.Ga. The Court will indicate significant points of dispute.

3. Plaintiffs maintain that FMC acted out of personal animus and not because of the alleged financial impropriety.

maintained that he was merely employing intercorporate loans.[4] Arguing that he would soon receive a loan from the National Bank of Georgia that would alleviate his problems, Allen persuaded FMC to reinstitute his standard credit arrangement. It was agreed that the alleged check-kiting scheme would stop and that Allen-Russell would permit a field credit review to verify that it had been stopped.

In August 1981, Mal Margerm of FMC performed the field credit review. He concluded that in each of June and July 1981, over $1,000,000 in checks had been exchanged between Allen-Russell and Carolina Dodge. Margerm also concluded that Allen-Russell had serious cash flow problems.

The parties dispute the details of Allen-Russell's cash management practices and the motives underlying those practices. Indeed, Allen vigorously denies any wrongdoing. Still, this much is clear—even if Allen-Russell was not involved in a check-kiting scheme, it could have appeared that way to an impartial observer. (As developed below, one of Allen-Russell's banks so concluded.) In addition, notwithstanding the issue whether Allen-Russell was technically guilty of check-kiting, the dealership's cash management techniques revealed severe fiscal instability.

In September 1981, FMC terminated permanently its relationship with Allen-Russell. Allen's bankers were also taking a close look at his dealerships' check transfers about this time. In fact, at one point First Atlanta Bank refused payment on over $800,000 worth of Allen-Russell's checks and thus caused a loss to North Carolina National Bank, which handled Carolina Dodge's account. First Atlanta also notified the Controller of the Currency, the United States Attorney, and the Federal Bureau of Investigation of the existence of an apparent check-kiting scheme. Allen-Russell filed for bankruptcy shortly thereafter, and several months later Ford formally terminated the dealership. With this background in place, the Court will turn to the pending motions, highlighting additional facts where necessary.

## II. *Discussion*

### A. *FMC's and Ford's Motions for Summary Judgment*

#### 1) *The Controlling Standard*

Plaintiffs have advanced several theories of liability against Ford and FMC, including the following: (1) a claim under the Automobile Dealers' Day in Court Act ("ADDCA"), 15 U.S.C. §§ 1221 *et seq.;* (2) a claim under the Georgia Motor Vehicle Dealers' Day in Court Act ("Georgia Dealers' Act"), O.C.G.A. §§ 10–1–630 *et seq.;* (3) a claim under the Georgia Motor Vehicle Fair Practices Act ("Georgia Fair Practices Act"), O.C.G.A. § 10–1–662(a)(7); (4) contract claims; (5) claims under *Giordano v. Stubbs,* 228 Ga. 75, 184 S.E.2d 165 (1971), *cert. denied,* 405 U.S. 908, 92 S.Ct. 960, 30 L.Ed.2d 779 (1972); (6) a wrongful foreclosure claim; (7) a claim by Allen for intentional infliction of emotional distress; and (8) a claim for interference with contractual relations. Ford and FMC have moved for summary judgment as to each of these claims.

Before addressing the merits of defendants' motions, the Court will set forth the standard controlling practice under Rule 56, Fed.R.Civ.P. Recent Supreme Court opinions have colored the light in which courts of the Eleventh Circuit must view summary judgment practice. *E.g., Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This Circuit had long held that even where "the non-moving party has the burden of proof at trial, ... [at] summary judgment ... the moving party has the burden of showing that there is no genuine issue of material fact." *United States v. One (1) 1944 Steel Hull Freighter,* 697 F.2d 1030, 1031 (11th Cir.1983). Under this standard, it was widely accepted that to prevail at summary judgment the moving party was required to

---

**4.** Allen states that he cannot recall the details of this meeting but contests defendants' version.

negate an essential element of the nonmoving party's claim. *Id.*

*Anderson* and *Celotex* have altered this standard. It is now clear that "the burden on the moving party may be discharged by 'showing'—that is, pointing out ... —that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 106 S.Ct. at 2554. Where such a showing demonstrates that there is no genuine issue of material fact and that, viewed in the light most favorable to the nonmoving party, the undisputed facts entitle the moving party to judgment as a matter of law, summary judgment is appropriate. *Anderson,* 106 S.Ct. at 2511. The nonmoving party cannot forestall summary judgment by resting on its pleadings or evidence that would be insufficient if presented at trial. As Justice White explained in *Anderson,*

> [S]ummary judgment should be granted where the evidence is such that it 'would require a directed verdict for the moving party.' ... And we have noted that the 'genuine issue' summary judgment standard is 'very close' to the 'reasonable jury' directed verdict standard: 'The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted' ... In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law....
>
> If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict ..., the judge must ask ... not whether he thinks the evidence unmistakably favors one side ... but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient....

106 S.Ct. at 2512 (citations omitted). The Supreme Court's recent pronouncements are consonant with the opinion harbored by many courts—where discovery has closed and where the record reveals that the plaintiff is destined to lose at the directed verdict stage, a trial represents a waste of judicial resources. The Court will now apply the appropriate standard to each of plaintiffs' claims.

### 2) *Plaintiffs' ADDCA Claim*

■ The ADDCA was enacted to protect automobile dealers from abusive trade practices employed by manufacturers in an extremely concentrated market. *See* Sen. Rep. No. 2073, 84th Cong., 2nd Sess. (1956), *reprinted in,* 3 U.S.Code Cong. & Admin. News 4596 (1956). Under 15 U.S.C. § 1222, dealers have a cause of action against "automobile manufacturers" who fail "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise...." Defendants argue (1) that FMC cannot be held liable under the ADDCA because it is not an automobile manufacturer; and (2) that the conduct alleged does not constitute bad faith. The Court will address these arguments in turn.

The statutory definition of "automobile manufacturer" provides as follows:

> The term 'automobile manufacturer' shall mean any person, partnership, corporation, association, or other form of business enterprise engaged in the manufacturing or assembling of passenger cars, trucks, or station wagons, *including any person, partnership, or corporation which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles.*

15 U.S.C. § 1221(a) (emphasis added). Citing the remedial purposes of the ADDCA, the Tenth Circuit has held as a matter of law that wholly-owned financing subsidiaries of manufacturers qualify as manufacturers. *Colonial Ford, Inc. v. Ford Motor Co.,* 592 F.2d 1126, 1129 (10th Cir.), *cert. denied,* 444 U.S. 837, 100 S.Ct. 73, 62

L.Ed.2d 48 (1979). Other courts have taken a narrower view, holding that subsidiaries can be deemed manufacturers only when they act as agents of a manufacturer. *E.g., DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 550 F.Supp. 1199, 1201 (N.D.Ill.1982). In *Colonial Ford,* the Tenth Circuit offered the following rationale for its view:

> The [ADDCA] is designed to curtail the kinds of coercion and intimidation of retail dealers by manufacturers made possible by the parties' relative economic inequality.... The most obvious point of leverage in the manufacturer-dealer relationship is financing. When ... a manufacturer uses a wholly owned subsidiary to facilitate that financing, it brings the subsidiary within the remedial purposes of the [ADDCA] whether or not it is shown that the manufacturer ordered the specific conduct complained of.

592 F.2d at 1129.

■ To be sure, the policy considerations cited by the Tenth Circuit are compelling. It is easy to imagine circumstances in which a manufacturer could use a wholly-owned subsidiary to coerce and intimidate a dealer. If the term manufacturer were accorded an overly narrow meaning, such conduct would be beyond the ambit of the ADDCA. In the final analysis, however, the Tenth Circuit's approach is incomplete. Even if a defendant can be termed a manufacturer, it cannot be held directly liable unless it is a party to the franchise agreement. 15 U.S.C. § 1221(b); *see Olson Motor Co. v. General Motors Corp.,* 703 F.2d 284, 287 (8th Cir.), *cert. denied,* 464 U.S. 894, 104 S.Ct. 240, 78 L.Ed.2d 231 (1983); *York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp.,* 447 F.2d 786, 791 (5th Cir. 1971); *Bonnano v. Chrysler Corp.,* 603 F.Supp. 832, 835 (S.D.Ohio 1985). Here, it is undisputed that FMC was not a party to the relevant franchise agreement.

Nonetheless, under standard agency principles, if a defendant is an agent of the manufacturer, its actions are cognizable under the ADDCA even though it may be a stranger to the franchise agreement. *Olson,* 703 F.2d at 287–88. The significant question, then, is not whether FMC is a manufacturer, but rather whether it is an agent of Ford. The Eighth Circuit has held that direct evidence of an agency relationship is not required and has upheld a jury's finding of agency based on scant factual support. *Id.* at 288. In the instant case, plaintiffs have failed to advert to any evidence establishing a specific or general agency. This failure may, however, result more from plaintiffs' misapprehension of the applicable law than from an actual lack of substantiation. Furthermore, given the valid policy considerations underlying the *Colonial Ford* decision, the Court is reluctant to dismiss plaintiffs' ADDCA claim without reaching the merits. Thus, because *Olsen* establishes a low threshold for showing agency, and because the Court is uncertain that the record cannot support a finding of agency, it will not grant summary judgment on this ground at this juncture.

■ As to defendants' second argument—that the conduct alleged does not constitute bad faith—it is well settled that the term "good faith" has a specialized meaning under the ADDCA. *Carroll Kenworth Truck Sales, Inc. v. Kenworth Truck Co.,* 781 F.2d 1520, 1525 (11th Cir. 1986); *Cabriolet Porsche Audi, Inc. v. American Honda Motor Co.,* 773 F.2d 1193, 1209–10 (11th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1641, 90 L.Ed.2d 186 (1986); *Bob Maxfield, Inc. v. American Motors Corp.,* 637 F.2d 1033, 1038–39 (5th Cir.), *cert. denied,* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981). Bad faith in the ordinary sense will not support an ADDCA claim; instead, there must be evidence of coercion or intimidation.[5] *E.g., id.*

5. Defendants have asked the Court to follow the line of cases holding that to be actionable the coercion and intimidation alleged by an ADDCA plaintiff "must include a wrongful demand that would result in penalties or sanctions if not complied with." *Wallace Motor Sales v. American Motor Sales Corp.,* 780 F.2d 1049, 1056 (1st Cir.1985); *accord Autohaus Brugger, Inc. v. Saab Motors, Inc.,* 567 F.2d 901, 911 (9th Cir.), *cert. denied,* 436 U.S. 946, 98 S.Ct. 2848, 56

This requirement stems from the plain language of the statute and from its legislative history. *See* Sen.Rep. No. 2973, *supra,* 3 U.S.Code Cong. & Admin.News at 4600–4601 (1956).

The wealth of case law interpreting the statute provides clear guidelines for determining whether a manufacturer has been guilty of coercion or intimidation. For example, coercing a dealer into relinquishing the right to sell competing car lines is actionable. *See, e.g., Cabriolet Porsche,* 773 F.2d at 1210. ("We have little doubt that had Honda threatened to deny Cabriolet ... cars to which it was entitled, unless Cabriolet provided an exclusive facility, this would be evidence of coercion"); *Rea v. Ford Motor Co.,* 497 F.2d 577 (3rd Cir.), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974). Similarly, a manufacturer's efforts to drive a dealer out of business can qualify as bad faith. *Junikki Imports, Inc. v. Toyota Motor Co.,* 335 F.Supp. 593 (N.D.Ill.1971); *see Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.,* 533 F.2d 510, 516 (10th Cir.1976).

On the other hand, if an ADDCA defendant has objectively valid reasons for terminating its relations with a dealer, the plaintiff cannot prevail absent evidence of an ulterior motive. *Carroll Kenworth,* 781 F.2d at 1527, 1527 n. 4; *see also York-Chrysler,* 447 F.2d at 791–92 ("[T]hat Chrysler Motors may have had grounds for lawful termination of the automobile dealership does not permit this court to set aside a jury verdict.... The [ADDCA] is not as concerned with what the parties did as it is concerned with why they did it").

In the instant case, plaintiffs allege three methods of intimidation and coercion:

(1) FMC's decision to suspend credit "on several occasions during a particularly bad economic time for the automobile industry generally;" and

(2) FMC's placement of employees at Allen-Russell to make certain that vehicles were not sold out of trust; and

(3) FMC's frequent audits of Allen-Russell.

Plaintiffs' Response to Defendants' Motions for Summary Judgment at 16–17. To be frank, plaintiffs' theory has the shrill ring of the cry of a child who has been caught with his hand in the cookie jar yet resents his mother's decision to place the jar out of reach. Plaintiffs' overall view appears to be that, because the dealership had been productive in the past, defendants were compelled to look the other way when vehicles were sold out of trust and when funds were exchanged in a suspect manner. Simply stated, this case strongly resembles cases in which objectively valid criteria justified a manufacturer's actions as a matter of law. *See Carroll Kenworth,* 781 F.2d at 1528; *Quarles v. General Motors Corp.,* 758 F.2d 839 (2nd Cir.1985) (per curiam). As noted, plaintiffs dispute the details of the alleged check-kiting scheme, but those disputes are immaterial. There can be no doubt that the sale out of trust and the check exchanges demonstrated, at the very least, a level of fiscal instability that would justify terminating credit. Accordingly, plaintiffs' claim can survive summary judgment only if there is evidence defendants acted pursuant to ulterior motives. *Carroll Kenworth,* 781 F.2d at 1527, 1527 n. 4. Plaintiffs have suggested two ulterior motives for defendants' actions: (1) that Ford sought the dealership property as attractive real estate; and (2) that local FMC employees had a personal vendetta against Allen.

■ As a matter of law, plaintiffs' first contention fails. There is nothing in the record to suggest that Ford desired to acquire the dealership property for development purposes or that it acted pursuant to

L.Ed.2d 787 (1978); *Rea v. Ford Motor Co.,* 497 F.2d 577, 585 (3d Cir.), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974). Defendants contend they are entitled to summary judgment under this standard because the contract at issue did not include a wrongful demand. The Court, however, declines to apply

the wrongful demand standard in the instant case. Although there are many Eleventh Circuit and former Fifth Circuit opinions on point, none applies the wrongful demand standard. Furthermore, as developed in text below, the intimidating conduct alleged here is the type against which the ADDCA is designed to protect.

such a goal. This alleged ulterior motive, which was not asserted in the briefs but which was offered at oral argument, is, in fact, contradicted by the record. When FMC foreclosed and acquired the property, it established a new dealer on the site, even though an appraisal had suggested that the prime value for the location might be other forms of development. *See* Transcript of Hearing Before Judge Jenrette, Superior Court of Fulton County at 332. Accordingly, plaintiffs' "land grab" theory is unsupported and implausible. *See Carroll Kenworth,* 781 F.2d at 1528; *cf. Anderson,* 106 S.Ct. at 2512.

■ There is, however, some support in the record for the personal vendetta theory. Glen Carson ("Carson"), an FMC employee, has stated by affidavit that the frequent audits of Allen-Russell were prompted by personal animus.[6] It might be argued that the personal animus alleged is not the type of improper motive the ADDCA addresses. But the legislative history makes it plain that Congress sought to protect dealers from the superior market power wielded by manufacturers. Specifically, the legislative report involving the ADDCA indicates that the statute is designed to protect dealerships from "rigid inspections of premises and accounts...." Sen.Rep. No. 2073, *supra,* 3 U.S.Code Cong. & Admin.News at 4598 (quoting H. Doc. 468, 76th Cong., 1st Sess., Report on Motor Vehicle Indus. at 1075). The Court can see little practical difference between market power used to accomplish an improper business purpose and market power used to accomplish a vindictive personal goal. Viewed in the light most favorable to plaintiffs, Carson's affidavit suggests that FMC employees sought to drive Allen out of business. Such conduct is proscribed by the ADDCA. *See Junikki Imports,* 335 F.Supp. at 595.

Still, the Court is reluctant to allow this claim to proceed to trial. Although the Court cannot say that Carson's affidavit presents an implausible view, it runs counter to the record as a whole. Carson states that "[t]he treatment Allen-Russell received was not related to [its] business activities ... but to the vendetta of Mr. Sanders for Mr. Allen."[7] The Court, however, finds it odd that anyone acquainted with credit operations could conclude that a $670,000 sale out of trust would not warrant close scrutiny of a dealer's operations. Indeed, there is nothing in Carson's affidavit to indicate that he was aware of the sale out of trust or the alleged check-kiting scheme. Moreover, the Court finds it difficult to believe that a mid-level FMC manager could drive a dealer out of business without cause and without the approval of FMC's and Ford's top managers. It is also difficult to understand why Ford would want to close down Allen-Russell if not for the alleged financial impropriety, since it is undisputed that the dealership was one of Ford's most productive. It is not as if Ford no longer wanted a dealer at that site; as noted above, Ford established a new dealership on the site after it acquired the property.

In sum, although the weight of the evidence on plaintiffs' ADDCA claim greatly favors defendants, the Court cannot hold that a reasonable jury would be compelled to reject plaintiffs' theory. Nonetheless, the Court is well-acquainted with the fine firm representing plaintiffs and is certain that it would have no desire to proceed with a frivolous case that might result in exposure under Rule 11, Fed.R.Civ.P. At the same time, defendants would obviously prefer to eliminate as many issues as possible without a trial. Accordingly, the Court thinks it advisable to deny defendants' motion on this claim with leave to renew. The Court would look favorably upon a motion

---

6. Defendants have moved to strike this affidavit, but the Court finds unavailing the arguments made in support of that motion.

7. The Court notes that, to the extent that based on Carson's affidavit plaintiffs advance dispar-

ate treatment as a ground for recovery, such an argument is foreclosed by *Carroll Kenworth Truck Sales v. Kenworth Truck Co.,* 781 F.2d 1520, 1527 (11th Cir.1986).

to reopen discovery for the limited purpose of deposing Carson. If his story turns out to be the speculation of a disgruntled or uninformed employee, defendants may well prevail on a renewed motion for summary judgment.[8] On the other hand, if certain of FMC's practices were vindictive, plaintiffs may have a viable claim, notwithstanding that FMC had legitimate grounds for terminating credit.

Therefore, the Court will deny with leave to renew defendants' motions for summary judgment with respect to plaintiffs' ADDCA claim.

### 3) *Plaintiffs' Claims Under the Georgia Dealers' Act and the Georgia Fair Practices Act*

■ Little needs to be said regarding plaintiffs' claims under the Georgia statutes. As defendants correctly point out, the statutes became effective after the conduct at issue occurred. Because the statutes affect the substantive rights of the parties, they cannot be given retroactive effect. *Georgia Franchise Practices Commission v. Massey-Ferguson, Inc.*, 244 Ga. 800, 262 S.E.2d 106 (1979).[9] Accordingly, defendants are entitled to summary judgment with respect to these claims.

### 4) *Plaintiffs' Contract Claims*

■ Plaintiffs maintain that FMC breached its contract with Allen-Russell by terminating credit without good cause. But, as noted above, *see supra* at 393, FMC had the unqualified contractual right to cut off credit to Allen-Russell. Thus, if plaintiffs have a cognizable claim arising out of the termination of credit, it must be based on the ADDCA.

Plaintiffs maintain that Ford breached the franchise agreement by (1) terminating it without cause; (2) sending notice of the termination to an improper address (the abandoned dealership); and (3) failing to pay certain benefits. The Court rejects plaintiffs' contentions. As to the first asserted breach, in light of the condition of the Allen-Russell dealership at the time of termination, it is plain that Ford had grounds for termination: insolvency is specifically noted as a cause for termination in the franchise agreement. As to the second asserted breach, plaintiffs have failed to identify a contractual clause that was violated by the allegedly defective notice. As to the third asserted breach, plaintiffs failed to satisfy the conditions precedent to the right to termination benefits.

Accordingly, the Court will grant defendants' motions for summary judgment as to plaintiffs' contract claims.

### 5) *Plaintiffs' Claims Under Giordano v. Stubbs*

■ Plaintiffs assert claims arising out of the foreclosure and sale of the Allen-Russell and Colonial dealership sites. Some additional factual background is necessary to place these claims in context. In 1980, Allen-Russell moved from its original dealership site to a location on Mt. Vernon Road in Fulton County (the "Mt. Vernon Property"). The National Bank of Georgia ("NBG") financed the construction of the dealership facilities and held a secured interest of $2,282,000. Allen, Russell, their spouses, and NBG arranged a buy-sell agreement under which FMC agreed to purchase the loan from NBG. On March 9, 1981, an assignment of loan documents from NBG to FMC was executed. On that same date, the note on the Mt. Vernon Property was amended and increased to $2,500,000. FMC also held a security deed on the Colonial dealership site.

In September 1981, Allen-Russell's financial problems caused it to default on the terms of the FMC security deed. Before Allen-Russell filed for bankruptcy, Allen

---

**8.** If a renewed motion were filed, the Court would demand a more specific showing by plaintiffs on the issue of agency. *See supra* at 396.

**9.** Plaintiffs argue that the Georgia statutes merely codify the common law, but they have failed to cite any Georgia common law precedent establishing liability under their view of the facts. Indeed, it seems clear that the prime reason for federal and state statutes protecting dealers was that the common law did not do so.

and his wife transferred their interests in the dealership to Allen-Russell. For some time, FMC was prevented from foreclosing by the automatic stay imposed under 11 U.S.C. § 362. On July 26, 1982, the Bankruptcy Court lifted the stay to permit FMC to exercise its powers of sale.

On September 7, 1982, FMC exercised its powers of sale over the dealership sites. FMC acquired the Mt. Vernon Property for $2,600,000, and the Curry Corporation bought the Colonial site for $1,330,200. Pursuant to O.C.G.A. § 44–14–161 *et. seq.*, FMC petitioned the superior courts in the relevant counties for confirmations of the sales, as is required before a creditor can seek a deficiency judgment. With respect to the Mt. Vernon Property, the Fulton County Superior Court found that FMC failed to prove that the sale brought fair market value but declined to order a resale. The DeKalb County confirmation proceeding, which involved the Colonial site, was dismissed by agreement of the parties.

Plaintiffs have alleged state law claims under *Giordano v. Stubbs*, 228 Ga. 75, 79, 184 S.E.2d 165 (1971), *cert. denied*, 405 U.S. 908, 92 S.Ct. 960, 30 L.Ed.2d 779 (1972). To prevail under *Giordano*, a plaintiff must establish that "[1] the price realized [by a sale] is grossly inadequate and [2] the sale is accompanied by either fraud, mistake, misapprehension, surprise or other circumstances which might authorize a finding that such circumstances contributed to bringing about the inadequacy of price...." *Id.* Plaintiffs' claims fail under this standard.

With respect to the Mt. Vernon Property, even if the Court assumes *arguendo* that plaintiffs could establish that the price obtained was "grossly inadequate," plaintiffs have failed to satisfy the second prong of the *Giordano* test. In other words, plaintiffs have not suggested any way in which the sale itself was infected with improper conduct. When addressing this issue,

plaintiffs speak in general terms of the alleged violations of duties imposed by the ADDCA. But plaintiffs have not indicated how ADDCA violations contributed to the allegedly inadequate price. *See id.* at 80, 184 S.E.2d 165; *Phillips v. Atlantic Bank & Trust Co.* 168 Ga.App. 590, 592, 309 S.E.2d 813 (1983). Plaintiffs' *Giordano* claim with respect to the Colonial Property is similarly deficient. Beyond that, it seems plain that the price obtained for that property could not be deemed grossly inadequate, since Allen-Russell petitioned the Bankruptcy Court to approve a sale on similar terms.

In sum, the Court will grant defendants' motions for summary judgment with respect to plaintiffs' claims under *Giordano*.

### 6) Plaintiffs' Wrongful Foreclosure Claim

Plaintiffs claim that FMC's foreclosure on the Mt. Vernon Property was wrongful with respect to 2.1 acres of land, which plaintiffs maintain had been released by FMC from the security deed. FMC denies that there was such a release and argues that, even if such a release were established, it would be unenforceable under the Statute of Frauds. O.C.G.A. § 13–5–30(4).

■ As a preliminary matter, if there was any consideration for the alleged release, plaintiffs have not brought it to the Court's attention. In addition, there is no writing that satisfies the Statute of Frauds. *See* W. Jaeger, *Williston on Contracts* § 492 (3d ed. 1960) (regarding the applicability of the Statute of Frauds to the instant case). Plaintiffs point to a legal description of the Mt. Vernon Property that was prepared by their attorney and attached to the assignment of loan documents.[10] Plaintiffs apparently argue that, because this legal description omits the 2.1 acres, it satisfies the Statute of Frauds with respect to the release.[11] The Court disagrees for at least two reasons.

---

10. It is undisputed that the attorney was not instructed to exclude the 2.1 acres from the legal description and that he did not tell anyone he had done so.

11. Plaintiffs have not specifically referred to the Statute of Frauds in their briefs. The Court's description of plaintiffs' argument on this point is based on its notes from oral argument. In

First, neither the assignment of loan documents nor the legal description is signed by FMC, "the party to be charged." *See* Affidavit of Paul J. Reimann (Exhibit A). It is true that at the closing FMC signed other documents, including an amendment to the promissory note, which altered the terms of the security agreement. But the amendment must be viewed as a separate document—analytically as well as physically—since FMC could not amend the note until it obtained the right to the loan documents.

Moreover, absent parol evidence, the legal description could not meet the requirements of the Statute of Frauds. Indeed, plaintiffs have, in essence, conceded this much. *See* Plaintiffs' Response to Defendants' Motions for Summary Judgment at 56–57. Under the Georgia Statute of Frauds, a contract transferring an interest in land is unenforceable if it "is partly in writing and partly in parol...." *Thompson v. Colonial Trust Co.*, 35 Ga.App. 12, 13, 131 S.E. 921 (1926); *see also Smith v. Cox*, 247 Ga. 563, 277 S.E.2d 512 (1981).

Accordingly, the Court will grant defendants' motion for summary judgment with respect to plaintiffs' wrongful foreclosure claim.

### 7) *Allen's Claim for Intentional Infliction of Emotional Distress*

■ Allen's claim for intentional infliction of emotional distress is based on two incidents that occurred during his hospitalization for heart problems. First, an FMC employee telephoned Allen to make arrangements for a "voluntary surrender" of the Colonial dealership. Second, FMC employees continued auditing the dealerships and required Allen-Russell employees to visit the hospital so that Allen could endorse checks.

■ Although Georgia recognizes a cause of action for intentional infliction of emotional distress, the tort has been construed narrowly. To sustain such a claim, the plaintiff must demonstrate that the "defendant's actions were so terrifying or insulting as naturally to humiliate, embarrass or frighten...." *Georgia Power Co. v. Johnson*, 155 Ga.App. 862, 863, 274 S.E.2d 17 (1980); *see also Young v. Colonial Oil Co.*, 451 F.Supp. 360 (M.D.Ga.1978) ("The acts of the defendant must be particularly outrageous so that the defendant's misdeed approaches ordinary assault"). Cases that satisfy this standard involve physically intimidating conduct that shocks the conscience. *E.g., American Finance & Loan Corp. v. Coots*, 105 Ga.App. 849, 125 S.E.2d 689 (1962) (defendant collected a bill at gunpoint); *Delta Finance Co. v. Ganakas*, 93 Ga.App. 297, 91 S.E.2d 383 (1956) (defendant threatened and bullied an unattended child into allowing him access to her home so he could obtain property to which he had no valid claim). On the other hand, standard collection techniques cannot ordinarily support a claim, notwithstanding that the plaintiff may have been in a somewhat vulnerable emotional or physical condition. *See Hamby v. Edmunds Motor Co.*, 80 Ga.App. 209, 55 S.E.2d 743 (1949). When the conduct alleged falls short of the applicable standard, judgment may be entered as a matter of law. *See id.; see also Sossenko v. Michelin Tire Corp.*, 172 Ga. App. 771, 324 S.E.2d 593 (1984).

In the instant case, Allen's intentional infliction of emotional distress claim founders. In fact, plaintiffs' counsel came close to conceding this point at oral argument. To be sure, it was bad form for FMC to conduct business directly with Allen while he was in a sickbed. But Allen does not allege that the FMC employee who telephoned him used abusive or intimidating language. Similarly, requiring an Allen-Russell employee to take a check to Allen for endorsement cannot be viewed as

their briefs, plaintiffs argue that NBG somehow transferred less than its total interest through the loan assignment. The Court is somewhat puzzled by this argument, inasmuch as plaintiffs have never asserted that NBG promised to release the 2.1 acres. In fact, there is nothing to suggest that NBG intended to pass less than its entire interest to FMC. Thus, plaintiffs' only argument would be that, before or after the transfer, FMC made an oral promise to release the acres.

shocking. It might be nice if business affairs and problems ceased when illness struck, but such is not the case. Moreover, it must be presumed that, if Allen's condition were truly serious, he would have been shielded from the outside world by his doctor.[12] Absent any precautions of this type, defendants' actions do not rise to the level of intentional infliction of emotional distress.

Accordingly, the Court will grant defendants' motion for summary judgment with respect to Allen's claim for intentional infliction of emotional distress.

### 8) Plaintiffs' Contractual Interference Claim

Plaintiffs' contractual interference claim rests on two contentions: "[(1)] that ... Allen-Russell was negotiating a sale of its facility in order to allow it to raise money and was essentially involved in a contract such that the terms of the contract were settled between the parties, but Defendants contacted potential purchasers in order to prevent those contracts from being performed[; and (2)] that Defendants contacted fleet and corporate lessees and attempted to create problems in the relationships between those customers and Allen-Russell." Plaintiffs' Response to Defendants' Motion for Summary Judgment on Count VIII of Allen-Russell's Complaint and Count IX of Allen's Complaint at 2.

█ Under Georgia law, "[i]nterference with contractual rights, such as inducing one to breach his contract with another, is an actionable tort." *Sheppard v. Post*, 142 Ga.App. 646, 647, 236 S.E.2d 680 (1977); *see also Rouse v. Crum*, 169 Ga.App. 439, 441, 313 S.E.2d 140 (1984). A plaintiff advancing such a claim need not prove that the defendant's conduct led to an actual breach of contract. *McDaniel v. Green*, 156 Ga.App. 549, 550, 275 S.E.2d 124 (1980) ("It is sufficient if the invasion retards performance of the duties under the contract or makes the performance more difficult or expensive"). Instead, the plaintiff

must prove three elements: (1) the existence of a contractual relationship; (2) interference from the defendant; and (3) resulting damage to the contractual relationship. *See id.* at 550–51, 275 S.E.2d 124. Applying this standard, the Court concludes that plaintiffs' first contention fails as a matter of law but that their second contention cannot be rejected at this juncture.

█ As to plaintiffs' first contention—that defendants interfered with the sale of the dealership—plaintiffs have not demonstrated (or even represented) that a valid contract was in place providing for a sale of the dealership. *See id.* at 551, 275 S.E.2d 124; *see also Rouse*, 169 Ga.App. at 441–42, 313 S.E.2d 140. In addition, there is nothing in the record to suggest that defendants' conduct damaged whatever contractual rights might have existed. Plaintiffs have failed to mention that the dealership was under the jurisdiction of the Bankruptcy Court during the relevant period. Surely, this fact must have posed a substantial obstacle to plaintiffs' attempted sale. Furthermore, the mere fact that the sale was not completed is not enough to support plaintiffs' claim. *See McDaniel*, 156 Ga.App. at 551, 275 S.E.2d 124. Finally, it appears that defendants' allegedly improper conduct involved efforts to pursue its foreclosure rights—efforts that are plainly privileged.

█ Plaintiffs' second contention—that defendants interfered with existing lease relationships—is somewhat more persuasive. There is no question that such interests would be legally protected, and Allen's deposition offers some support for plaintiffs' assertion that FMC interfered with lease relationships. *See* Deposition of James H. Allen at 223. It may well be that the conduct cited by Allen was privileged, but defendants have not so demonstrated. *See Atlanta National Baseball Club, Inc. v. Kuhn*, 432 F.Supp. 1213, 1216 (N.D.Ga. 1977).

---

**12.** In fact, Allen has not argued that his condition was particularly serious during the relevant period.

Accordingly, the Court will grant in part and deny in part with leave to renew defendants' motion for summary judgment with respect to plaintiffs' contractual interference claim.

### B. *Plaintiffs' Motions for Judgment on the Pleadings and for Summary Judgment*

Plaintiffs have moved to dismiss under Rule 12(c), Fed.R.Civ.P., various counterclaims asserted by defendants, including: (1) defendants' claim for libel and slander to real estate; (2) defendants' bankruptcy fraud claim; and (3) defendants' RICO claim. Plaintiffs have also moved for summary judgment as to specified counts of defendants' counterclaims.

#### 1) *Plaintiffs' Motions for Judgment on the Pleadings*

##### a) defendants' claim for libel and slander to real estate

■ Defendants' claim for libel and slander to title is predicated upon a *lis pendens* plaintiffs filed on the Mt. Vernon Property. A *lis pendens* is a pleading, however, and is therefore privileged. *Ferguson v. Atlantic Land & Development Corp.*, 248 Ga. 69, 281 S.E.2d 545 (1981). Defendants argue that an exception to this privilege should exist where the party who files the *lis pendens* lacks a colorable claim to the property at issue, but they have not cited any authority for such an exception.

Accordingly, the Court will dismiss defendants' claim for libel and slander to real estate.

##### b) defendants' fraud claim

Plaintiffs assert that defendants' fraud claim is an attempt to create a private right of action arising out of various federal statutes. Plaintiffs further argue that defendants' attempt must fail under *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which sets forth the standard for determining whether an implied right of action exists. The Court disagrees with plaintiffs' characterization of defendants' fraud claim, however. In the Court's view, defendants' claim is for common law fraud. Thus, *Cort v. Ash* is inapposite.

Accordingly, the Court will deny plaintiffs' motion for judgment on the pleadings as to defendants' fraud claim.

##### c) defendants' RICO claims

Defendants' claim under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), is based upon the alleged check-kiting scheme and upon Allen's activity in connection with the bankruptcy proceeding. Plaintiffs have moved to dismiss this claim, relying, in large measure, on precedent rejected in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). In the wake of *Sedima*, plaintiffs have only two plausible arguments in opposition to defendants' claim: (1) that check-kiting is not a predicate act; and (2) that defendants have not suffered any injury resulting from the predicate acts alleged.

■ The Court rejects plaintiffs' first argument. Defendants allege that Allen-Russell arranged a check-kiting scheme through telephone communication. Accordingly, defendants have asserted a sufficient predicate act under 18 U.S.C. § 1343. *See United States v. Foley*, 683 F.2d 273 (8th Cir.), *cert. denied*, 459 U.S. 1043, 103 S.Ct. 463, 74 L.Ed.2d 613 (1982). Even if check-kiting were not a predicate offense, bankruptcy fraud is specifically noted as a predicate offense in 18 U.S.C. § 1961, and defendants have alleged that Allen committed bankruptcy fraud.

As to plaintiffs' second argument, the damages alleged as a result of the bankruptcy fraud are clear. The Court is less certain that any damage resulted from the check-kiting scheme and would require a more specific showing on this point when and if the case comes to trial. Still, defendants' RICO claim can withstand a motion for judgment on the pleadings.

Accordingly, the Court will deny with leave to renew as a motion for summary

judgment [13] plaintiffs' motion for judgment on the pleadings as to defendants' RICO claim. For similar reasons, the Court also will deny plaintiffs' motion to dismiss defendants' Georgia RICO claim, O.C.G.A. §§ 16–4–1 *et seq.*

### 2) *Plaintiffs' Motion for Summary Judgment as to Specified Counterclaims*

#### (a) collateral estoppel and release

Plaintiffs maintain that the claim asserted in Count II of defendants' counterclaims is barred by two orders of the Bankruptcy Court under the doctrine of collateral estoppel and by the settlement approved by the Bankruptcy Court. The Court disagrees.

Collateral estoppel is applicable "if the issue in the subsequent proceeding is identical to the one involved in the prior action, the issue was actually litigated, and the determination of the issue was necessary in the prior action." *Williams v. Bennett,* 689 F.2d 1370, 1381 (11th Cir.1982), *cert. denied,* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). At the outset, the Court notes that orders of a bankruptcy court are weak candidates for the application of collateral estoppel, given the peculiar nature of bankruptcy proceedings. *Cf. In re Texlon Corp.,* 596 F.2d 1092, 1101 (2d Cir.1979). Bankruptcy cases often change complexion rapidly, and, as a result, bankruptcy orders are frequently modified. *See, e.g., id.* Indeed, in this case, the Bankruptcy Court later vacated one of the orders upon which plaintiffs base their collateral estoppel argument.

■ The Court has reviewed the bankruptcy orders and proceedings and concludes that defendants' claims are not precluded. With respect to the September 10, 1984, order, the Bankruptcy Court assumed the truth of defendants' allegations; there-fore, defendants did not receive an adverse determination on the pertinent factual disputes. As to the April 29, 1982, order, this order could not give rise to collateral estoppel, since, as noted above, it never became final.

■ Turning to the settlement agreement, the Court is not certain it appreciates the thrust of plaintiffs' argument. Plaintiffs apparently maintain that the settlement with respect to claims against Allen that was reached by the trustee and approved by the Bankruptcy Court serves to bar any claim for fraud. In support of this argument, plaintiffs cite *In re Smythe,* 28 B.R. 882 (Bankr.D.Col.1983), which holds that the trustee's power of avoidance cannot be utilized by the creditors. The Court sees nothing in *Smythe* to suggest that a separate fraud claim for damages is precluded by virtue of the trustee's power of avoidance, and plaintiffs have not cited any case supporting such a proposition.

#### (b) counts V, VI, and VII of defendants' counterclaims

■ Through the above-referenced counterclaims, defendants seek to recover debts incurred by plaintiffs in connection with wholesale vehicle purchases. Plaintiffs argue that these claims are, in essence, deficiency claims. Thus, the argument goes, defendants cannot recover on these debts because the foreclosure sales were not confirmed pursuant to O.C.G.A. § 44–14–161 *et seq.; see supra* at 399–400. Plaintiffs' argument for defining these claims as deficiency claims is based on a "dragnet clause" in the security deed, under which "indebtedness" was defined as "the principal and interest on and all other amounts, payments and premiums due under the note or deed to secure debt, and . . .

---

**13.** The Court notes that plaintiffs' motion was styled in the alternative—they also sought summary judgment. But the Court did not formally convert the motion; accordingly, the Court cannot consider the motion to be one for summary judgment. *See, e.g., Milburn v. United States,* 734 F.2d 762 (11th Cir.1984). The Court will allow plaintiffs the option of renewing this motion under the current law and under the summary judgment standard; if the motion is renewed and properly supported, defendants will need to present a triable issue as to the alleged injury.

any and all other indebtedness of borrowers to lender now due or hereafter owing."

Georgia courts have rejected arguments nearly identical to the one advanced by plaintiffs. *Salter v. Bank of Commerce,* 189 Ga. 328, 6 S.E.2d 290 (1939); *Baker v. NEI Corp.,* 144 Ga.App. 165, 166, 241 S.E.2d 4 (1977); *Vaughn & Co. v. Saul,* 143 Ga.App. 74, 75–77, 237 S.E.2d 622 (1977). In *Vaughn,* the Georgia Court of Appeals dealt with a dragnet clause quite similar to the one involved here. The creditor in *Vaughn* made three separate loans to the debtor, and each loan was secured by a security deed to a separate parcel of land. The creditor exercised its power of sale as to one of these parcels but did not have that sale confirmed. The debtor argued that this failure barred any action on the other security deeds because, in light of the dragnet clause, such claims should be viewed as deficiency claims. Rejecting this argument, the court stated the following:

> We hold that the present action is not to recover a *deficiency* judgment on the debt for which foreclosure was had, but to recover on a separate, subsequent and different note made a year later for a different debt and for which a conveyance of other property was made as security. The note sued upon is a separate transaction from that which was the basis for foreclosure....

143 Ga.App. at 77, 237 S.E.2d 622 (emphasis in original).

Plaintiffs seek to distinguish *Vaughn* on the grounds that the debts at issue in this case existed before the imposition of the dragnet clause, whereas the debts at issue in *Vaughn* were created after the imposition of the dragnet clause. The Court rejects this distinction for two reasons.

First, the rule advocated by plaintiffs is not designed to serve the policy goals underlying the confirmation requirement. In a thorough and well-reasoned opinion, Judge Hall explored those policy goals and stated the following:

> [C]onfirmation statutes are thought necessary to prevent inequities that arise when a creditor buys property on which it has foreclosed at a low price when property values are depressed ... and then proceeds to seek a personal judgment against the debtor for the difference between the low price ... and the balance of the debt.... Thus, the [confirmation] statute is designed to protect debtors from deficiency judgments when their property has been sold at a foreclosure sale for less that its fair market value.

*Redman Industries v. Tower Properties, Inc.,* 517 F.Supp. 144, 149 (N.D.Ga.1981) (citations omitted). The way to guard against the scenario outlined by Judge Hall is to prevent a creditor from collecting on debts related to the property that was foreclosed. *Id.* at 151–52. Despite the fact that certain unrelated debts may be subject to a dragnet clause, allowing a creditor to seek judgment on such debts does not expose a debtor to unfairness arising out of the sale of the property at a depressed price.[14] The critical inquiry, then, is the relationship between the debts, not the timing of their creation. It is undisputed that, in the instant case, the debts sought are unrelated to the debt on which FMC foreclosed.

Furthermore, the case law does not support plaintiffs' proffered distinction. For example, the dragnet provision in *Vaughn,* like the provision presented here, made the foreclosed property "security for all debts and obligations *either then or thereafter* owed...." 143 Ga.App. at 76 (emphasis added). In allowing the debtor to pursue a debt unrelated to the foreclosed property, the court did not indicate that a different result would have obtained if the debt had predated the dragnet clause.

### (c) defendants' contractual interference claim

■ Defendants assert that Allen and trustee Stamps interfered with their rela-

---

**14.** In fact, dragnet clauses are primarily designed to give a creditor the option to apply the surplus garnered through a foreclosure sale to other debts. *See Jerkins v. Savannah Valley Production Credit Ass'n,* 157 Ga.App. 652, 654, 278 S.E.2d 431 (1981).

tionship with the dealer who took over the Allen-Russell site, Larry Ewers ("Ewers"). The Court has previously set forth the controlling standard and will not repeat that discussion. *See supra* at 402. Plaintiffs concede that the relationship between Ewers and defendants was legally protected but argue that they are entitled to judgment because no interference occurred and because any actions taken by Stamps or Allen were privileged.

To counter plaintiffs' first argument, defendants have submitted testimony from a related case in which Ewers stated that he terminated his relations with defendants because of his contact with Allen. Specifically, it appears that Ewers feared litigation if he continued doing business with defendants. Plaintiffs argue that Ewers' testimony is inadmissible because it is not part of the record in the instant case. The Court will not, however, ignore the credibility questions raised by this testimony. Although the Court would not grant affirmative relief to a party based on materials outside the record, the testimony offered suffices to undercut the weight accorded Ewers' affidavit. This credibility dispute cannot be resolved at summary judgment.

Although plaintiffs' privilege argument is persuasive, it will not carry the day at this juncture. Interference with contractual relations does not apply where a defendant's conduct is privileged. *E.g., Atlanta National League Baseball Club*, 432 F.Supp. at 1226. The burden is on the defendant to establish this qualified privilege. *Id.* Here, Stamps has established as a matter of law that he acted pursuant to his fiduciary duty to the debtor's estate. *See* W. Prosser, *The Law of Torts* § 129 at 943–44 (4th ed. 1971). Allen also had a privilege, *viz.*, "to protect ... a prior contract of his own...." *Id.* at 944 (footnote omitted). There is an issue of fact, however, as to whether Stamps and Allen abused their qualified privilege in that they knew or should have known that Allen-Russell lacked a valid claim to the site and the dealership.

Therefore, the Court will deny plaintiffs' motion for summary judgment as to specified counterclaims.

### III. *Conclusion*

In sum, the Court GRANTS IN PART and DENIES IN PART WITH LEAVE TO RENEW defendants' motions for summary judgment; GRANTS plaintiffs' motion to dismiss defendants' claim for libel and slander to real estate; DENIES plaintiffs' motion to dismiss defendants' fraud claim; DENIES WITH LEAVE TO RENEW plaintiffs' motion to dismiss defendants' RICO claims; and DENIES plaintiffs' motion for summary judgment as to specified counterclaims.

The Court will also DENY plaintiffs' motion to file a supplemental pleading because, in ruling on the other pending motions, it has rejected the arguments advanced by that pleading. Accordingly, the supplemental pleading must be termed futile, and leave to amend need not be granted. *E.g. Halliburton & Associates, Inc. v. Henderson, Few & Co.*, 774 F.2d 441, 444 (11th Cir.1985). Finally, the Court DENIES the various motions to strike.

IT IS SO ORDERED.